# EXHIBIT 1

**IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA**
**CIVIL DIVISION**

COVER SHEET

| Plaintiff(s) | CIVIL DIVISION |
|---|---|
| Ralph Smith, individually and on behalf of all those similarly situated | **Case Number :**  GD - 19 - 001929 |
| | **Type of pleading :**  Complaint |
| | **Code and Classification :** |
| | **Filed on behalf of**  Plaintiff  (Name of the filing party) |
| Vs | ☑ Counsel of Record  ☐ Individual, If Pro Se |
| **Defendant(s)**  Allegheny Technologies Inc. and Strom Engineering Corporation | **Name, Address and Telephone Number :**  Joseph H. Chivers Esq.  The Employment Rights Group  100 First Avenue, Suite 650  Pittsburgh PA 15222  Tel.: (412) 227-0763 |
| E-FILED  FEB 06 2019  CIVIL/FAMILY DIVISION  DEPT. OF COURT RECORDS  ALLEGHENY COUNTY, PA | **Attorney's State ID :** 39184 |
| | **Attorney's Firm ID :** |

GD-19-001929

[cover]

### IN THE COURT OF COMMON PLEAS OF
### ALLEGHENY COUNTY, PENNSYLVANIA
### CIVIL DIVISION

| | | |
|---|---|---|
| Ralph Smith, individually and on behalf of all those similarly situated, | ) ) ) | Case No._____ |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Jury Trial Demanded |
| Allegheny Technologies, Inc., and Strom Engineering, Corporation. | ) ) ) | Class Action |
| Defendants. | ) ) ) | |

### <u>NOTICE TO DEFEND</u>

You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the Court without further notice for any money claimed in the complaint or for any claim or relief requested by the Plaintiff. You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER, TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.

IF YOU CANNOT AFFORD A LAWYER, THIS OFFICE MAY BE ABLE TO PROVIDE YOU WITH INFORMATION ON AGENCIES THAT MAY OFFER LEGAL SERVICES TO ELIGIBLE PERSONS AT A REDUCED FEE OR NO FEE.

LAWYER REFERRAL SERVICE
ALLEGHENY COUNTY BAR ASSOCIATION
11TH FLOOR KOPPERS BUILDING
436 SEVENTH AVENUE
PITTSBURGH, PA 15219
TELEPHONE: (412) 261-5555

**IN THE COURT OF COMMON PLEAS OF**
**ALLEGHENY COUNTY, PENNSYLVANIA**
**CIVIL DIVISION**

| | | |
|---|---|---|
| Ralph Smith, individually and on behalf of all those similarly situated, | ) ) ) ) | Case No._____ |
| Plaintiff, | ) ) | |
| v. | ) ) | Jury Trial Demanded |
| Allegheny Technologies, Inc., and Strom Engineering, Corporation. | ) ) ) ) | Class Action |
| Defendants. | ) ) ) | |

<u>**VERIFIED CLASS ACTION COMPLAINT**</u>

Plaintiff Ralph Smith ("Plaintiff"), individually and on behalf of all others similarly situated, files this Class Action Complaint ("Complaint") against Defendants Allegheny Technologies, Inc. ("ATI") and Strom Engineering Corporation ("Strom") (together, "Defendants"), seeking all available relief under Pennsylvania law. Plaintiff alleges the following based upon personal knowledge as to his own acts, and based upon the investigation conducted by his counsel, as to all other allegations.

## JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction over all claims in this action.

2.      This Court has personal jurisdiction over Defendants, as Defendants continuously and systematically conducted, and continue to conduct, business in the Commonwealth of Pennsylvania. Defendants have purposefully availed themselves of the privilege of conducting business in the Commonwealth, thus invoking the benefits and protections of Pennsylvania laws.

3.      Venue is proper because the claims herein occurred in whole or part in this jurisdiction.

## PARTIES

A.      **PLAINTIFF**

4.      Plaintiff Ralph Smith is an individual currently residing in North Carolina. He was hired by Strom to serve as part of the replacement workforce during ATI's lockout of its unionized workers, and was jointly employed by Defendants ATI and Strom at ATI's Brackenridge, Pennsylvania facility (the "Brackenridge ATI Plant") as a non-exempt hourly worker from approximately August 2015 through March 2016.

B.      **DEFENDANTS**

5.      Defendant Allegheny Technologies, Inc. ("ATI") is a Delaware corporation headquartered at 1000 Six PPG Place, Pittsburgh, Pennsylvania, and operates worldwide. ATI is a

2

publicly traded company on the New York Stock Exchange. ATI operates specialty material manufacturing plants in over 30 locations across the United States, including in this judicial district. This case concerns workers in ATI's Flat Rolled Product segment. ATI's sales in the Flat Rolled Product segment in 2016 totaled approximately $1.2 billion.

6.      Defendant Strom Engineering Corporation ("Strom") is a Minnesota corporation headquartered in Minnetonka, Minnesota. Strom provides replacement labor staffing for employers involved in labor disputes across the United States, including for co-Defendant ATI in this judicial district.

**CLASS ACTION DEFINITION**

7.      Plaintiff brings this lawsuit as a class action pursuant to Fed. R. Civ. P. 23, on behalf of himself and the following class:

> All current or former hourly employees who were provided by Strom as a replacement labor force and who performed work at any ATI facility in Pennsylvania (Bagdad, Brackenridge, Latrobe, Midland, Natrona Heights, Vandergrift and/or Washington) during the August 15, 2015 to March 4, 2016 lockout and labor dispute between ATI and the United Steel, Paper, and Forestry, Rubber, Manufacturing Energy Allied Industrial and Service Workers International Union, AFL-CIO, CLC ("USW") (the "Pennsylvania Class").

8.      Plaintiff reserves the right to redefine the Pennsylvania Class prior to class certification, and thereafter, as necessary.

**FACTUAL ALLEGATIONS**

**A.   BACKGROUND**

9.      Defendant Strom, a privately-held corporation, provides staffing in the form of strike and lockout replacement labor for unionized employers at locations throughout the United States.

10.      Employers' increasing use of temporary workers and hostility towards labor unions have been a feature of the modern labor market since the 1970s. Agencies like Strom, that

3

specialize in strike staffing (including staffing during a lockout) represent an emerging force that capitalize on the ample supply of individuals who have been pushed to operate within a temporary, informal workforce, and use these individuals as a weapon against organized labor.[1]

11.     In doing so, these strike-busting agencies and the companies that hire them not only exert downward pressure on working standards, benefits, and conditions for workers in general, but do so on the backs of temporary workers who are uniquely vulnerable to exploitation and limited in their ability to organize or advocate for their rights.[2]

12.     Although there has been a long history of employers hiring replacement workers to oppose union organizing, the scale of worker replacement afforded by strike-busting agencies like Strom takes this anti-union tool to an entirely new level.[3] Strike-busting agencies are able to mobilize hundreds or thousands of skilled or semi-skilled workers with little to no notice, lowering the hurdles for employers taking hardline stands against union demands and eliminating any negative implications to a company's productivity.

13.     These features are central to the services Strom offers, which are advertised as calling upon a "30,000+ employee database to identify Strom employees with project-relevant experience," "eliminate[ing] the lead-time generally associated with the activation of temporary replacement workers", and ensuring that Strom demonstrates "to union leaders that direct action is being taken to make sure all company obligations are met without exception." http://www.stromengineering.com/staffing/strike-staffing/ (last accessed February 4, 2019).

---

[1] *See generally* Erin Hatton, *Temporary Weapons: Employers' Use of Temps against Organized Labor*, 67(1) Cornell I.L.R. 86 (2014).
[2] *Id.* at 105-06.
[3] *Id.* at 91.

14.     Strom bills itself as offering "unparalleled experience" in aiding employers through a labor dispute:

> If your business is facing a potential labor disruption, we can help you minimize the possible repercussions. Strom offers a five-phase approach for providing strike replacement staffing during a labor disruption situation: assessments, recruiting, pre-deployment, deployment, and disbandment. **When you utilize our comprehensive industrial strike staffing services, we will determine your business's unique needs, locate, accommodate, and train qualified workers,** *secure safe transportation across picket lines*, **and follow the appropriate protocol for strike staffing disbandment after a new labor contract has been approved.** Strom offers unparalleled experience developing comprehensive business continuity plans, custom-tailored to meet each client's specific needs.

https://www.stromengineering.com/staffing/strike-staffing/ (last accessed February 4, 2019) (emphasis added).

15.     Touting its position as "the nation's most reputable industrial strike staffing company" with over "55 years of experience in labor staffing and 25 years of experience providing strike staffing," Strom's promotional statements hint at the larger historical context within which Strom's activities and those of the companies with whom it contracts should be understood. http://www.stromengineering.com/about/about-strom/ (last accessed February 4, 2019).

16.     Strom's business pits working people against each other. "Their business is pain and misery for working people," an official of the Bakery, Confectionary, Tobacco Workers and Grain Millers Union was quoted in a local newspaper as saying. "They're just a misery machine."[4]

---

[4] *See* Len Boselovic, *Embattled unions resent Strom replacement workers,* Pittsburgh Post Gazette (Aug. 23, 2015), http://www.post-gazette.com/business/pittsburgh-company-news/2015/08/23/Stroms-replacement-workers-often-displace-union-force-Allegheny-Technologies/stories/201508210104.

17.     Meanwhile, the structure of strike-busting agencies' employment of replacement workers places those workers in a uniquely precarious position that makes it nearly impossible for them to organize and advocate for their own labor rights.[5]

18.     While strike-busting agencies employ thousands of replacement workers, these workers do not work together consistently but are sent from workplace to workplace, isolated from both their replacement and union counterparts and thus limited in their ability to organize and advocate for themselves.

19.     Even if they are stationed at one worksite for an extended period, few replacement workers can risk engaging in union activities or other advocacy because they could immediately lose their current job as well as any future assignments by being identified as trouble-makers. As such, the structural ambiguity of temporary employment places logistical limitations on traditional labor protections.

20.     With neither job security, the ability to organize, nor ready access to traditional labor protections, replacement workers are extremely vulnerable. They are at the mercy of the strike-busting agencies and companies whose priorities center on ensuring continuity in their own operations, frequently at the expense of the work conditions and basic rights of the replacement workers that make this possible.

**B.     ATI'S 2015-16 LOCKOUT OF USW WORKERS**

21.     Strom's engagement with ATI provides an example of the way in which these strategies not only undercut union negotiating power and allow companies to evade their traditional obligations as employers, but lead to violations of the rights of the replacement workers who are least empowered to advocate for themselves.

---

[5] *See* Erin Hatton, *Temporary Weapons: Employers' Use of Temps against Organized Labor*, 67(1) Cornell I.L.R. 86, 105-06 (2014).

22.    Defendant ATI, a NYSE publicly-traded corporation, manufactures and supplies specialty metals, including steel and other types of materials for its customers worldwide.

23.    ATI operates in two business segments: High Performance Materials & Components, and Flat Rolled Products. This case concerns the Flat Rolled Products segment.

24.    ATI's Flat Rolled Products segment produces, converts and distributes stainless steel, nickel-based alloys, specialty alloys, and titanium and titanium-based alloys, in a variety of product forms including plate, sheet, engineered strip, and Precision Rolled Strip products. The major end markets for ATI's flat-rolled products are oil & gas, automotive, food processing equipment and appliances, construction and mining, electronics, communication equipment and computers, and aerospace & defense.

25.    ATI employs approximately 8,500 full-time employees. Approximately 40% of its workforce is covered by collective bargaining agreements ("CBAs"), including with the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC ("USW").

26.    ATI was a party to specific CBAs with the USW that expired on June 30, 2015.

27.    These CBAs covered production, maintenance, and hourly clerical employees at many of ATI's facilities in the United States, including ATI's operating plants in Bagdad, Brackenridge, Latrobe, Midland, Natrona Heights, Vandergrift, and Washington, Pennsylvania; Albany, Oregon; Lockport, New York; New Bedford, Massachusetts; and Waterbury, Connecticut.

28.    The USW-represented ATI employees at these locations worked under terms of the expired contracts into August 2015.

7

29.     When USW did not accept ATI's contract term demands, ATI instituted a lockout of its union workforce that was subject to these CBAs.[6]

30.     A lockout is a temporary work stoppage or denial of employment initiated by the management of a company during a labor dispute.

31.     The lockout, which began on August 15, 2015, was the biggest and longest in Western Pennsylvania in decades.

32.     The affected workforce included more than 2,200 employees at 12 facilities in ATI's Flat Rolled Product segment, including at ATI's plants in Bagdad, Brackenridge, Latrobe, Midland, Natrona Heights, Vandergrift, and Washington, Pennsylvania; Albany, Oregon; Lockport, New York; New Bedford, Massachusetts; and Waterbury, Connecticut.

33.     According to public news reports, the USW never threatened to strike or conducted a strike authorization vote during its talks with ATI. Instead, ATI locked these workers out of their jobs to put pressure on them to give in to ATI's demands over the contract negotiations. The dispute between the USW and ATI was over employees' health care.[7]

34.     The lockout lasted throughout the fall and winter and ended in March 2016, when ATI and the USW entered into a new contract. The lockout ended shortly after unemployment benefits ran out for many union members. ATI stopped paying for workers' health insurance in November 2015.

---

[6] See USW Members at ATI Ratify New Contract, Pittsburgh's Action News 4 (Mar. 1 2016), http://www.wtae.com/news/ati-usw-reach-tentative-deal-after-6month-lockout/38135720.

[7] See Justine Coyne, What ATI's lockout means for the company, employees, Pittsburgh Business Times, (Apr. 14, 2015), http://www.bizjournals.com/pittsburgh/news/2015/08/14/what-atis-lockout-means-for-the-company-employees.html.

35.     The new labor agreement reached between ATI and the USW was important to ATI's business. ATI's CEO, Richard Harshman, wrote about the dispute in ATI's 2016 Annual Report, describing "difficult labor negotiations" with a "seven-month work stoppage" that resulted in an agreement that "includes important changes to retirement benefit programs and other changes affecting plant operations that improve our cost competitiveness."[8]

36.     According to a Pennsylvania State University Professor and Director of the School of Labor and Employment Relations, "ATI's approach to labor relations is the worst kind of destructive approach that a company can have, and it can have long-lasting implications."[9]

## C.     ATI CONTRACTS WITH STROM TO PUT PRESSURE ON THE USW BY UTILIZING A REPLACEMENT WORKFORCE

37.     In response to the lockout, the USW mobilized its members to protest ATI's decision. Relevant to this case, these protests included picket lines and rallying at plant gates.[10]

38.     Picketing is a form of protest whose aims are to put public pressure on the business through attempting to prevent replacement workers from entering the site and providing publicity to the issue being protested.

39.     Hundreds of unionized USW workers marched to and around ATI's plant gates to protest the lockout.

---

[8] See ATI 2016 Annual Report, "2016 Creating Long-Term Value Thru Relentless Innovation," at http://ir.atimetals.com/~/media/Files/A/ATIMetals-IR/annual-reports/ati2016ar.pdf at 6.

[9] See Alex Nixon and Tom Yerace, *Bad Blood in ATI Lockout Expected to Linger*, TRIBLIVE (Feb. 23, 2016), http://triblive.com/business/headlines/10023623-74/ati-union-labor.

[10] See United Steel Workers, *Picket Lines are Strong in All Locations as ULP Lockout at ATI Rolls Into Second Week* (August 22, 2015), https://www.usw.org/news/media-center/articles/2015/picket-lines-are-strong-in-all-locations-as-ulp-lockout-at-ati-rolls-into-second-week.

40.     Throughout the lockout, USW members held picket lines at ATI's affected plants. At least one picket line, in Bagdad, Pennsylvania, just before Christmas, even continued in the midst of a snowstorm.

41.     For example, the picture below[11] was posted on the USW website during the lockout:



42.     While the affected USW workers suffered from the lockout through loss of work and wages, ATI took measures to avoid a work stoppage and concurrent damage to its business by employing a non-unionized temporary workforce provided by Strom to cross picket lines and keep the affected plants in operation.

43.     ATI utilized this Strom-provided temporary workforce to put pressure on the USW to accept ATI's demands while simultaneously keeping its operations running.

44.     Strom typically hires workers who are not from the local community where the lockout occurs, and who are in need of hourly work to support themselves and their families.

45.     These temporary workers, including Plaintiff and Class Members, are brought in by Strom to the geographic area at issue and housed at local hotels and motels away from their families and communities during the pendency of the work assignment.

---

[11] *Id.*

46.     The temporary workers, including Plaintiff and Class Members, worked long hours to keep production up at ATI's facilities during the lockout.

47.     ATI and Strom paid Plaintiff and the Pennsylvania Class Members on an hourly basis.

48.     The coordinated provision of temporary, replacement staffing, including getting the temporary workforce across the USW picket lines and into the plants, was integral and indispensable to ATI's ability to continue to put pressure on the USW during the pendency of the lockout and keep up production.

49.     Both ATI and Strom were well aware of the importance of providing the temporary workforce with safe and coordinated entrance through the USW picket lines and into ATI's facilities as a way to undermine the USW's negotiating power.

50.     For example, a job posting identified as being posted by ATI and/or Strom on Craigslist, a classified advertisement website, explicitly specified that the primary purpose of the employment was to address what was emphasized as "A LABOR DISPUTE SITUATION" in which "EMPLOYEES WILL BE TRANSPORTED ACROSS A PICKET LINE."[12]

---

[12] *Id.* (quoting craigslist advertisement) (emphasis in original).



51.     Notwithstanding the importance of the transport of the temporary workforce to and across picket lines – indeed, Strom's entire business model is built on and premised on it, and getting the temporary workforce through the picket lines was integral and indispensable for ATI to be able to keep up production in light of the lockout, so much so that ATI paid a third party, Strom, to do so – neither ATI nor Strom provided any compensation to Plaintiff and Class Members for these activities.

**D.     WORK PERFORMED BY PLAINTIFF AND THE CLASS MEMBERS**

52.     Defendants Strom and ATI hired Plaintiff and the Pennsylvania Class Members to replace one or more individuals in ATI's union workforce throughout the pendency of the lockout.

53.     ATI and Strom are joint employers of Plaintiff and Class Members.

54.     The work that Plaintiff and Class Members performed, including traveling to and across picket lines, was performed at both ATI's and Strom's direction, and was both directly and indirectly in ATI's and Strom's interests and for their collective benefit.

12

55.    For example, ATI incurred a benefit from this work because it could keep its facilities open and exert additional pressure on the USW during the pendency of the lockout as a direct result of the work performed by Plaintiff and Class Members.

56.    Strom incurred a benefit from this work because it was being paid by ATI for its services in providing the temporary workforce during the lockout, including to transport replacement workers across picket lines.

57.    Defendants controlled Plaintiff's work and the work of the Pennsylvania Class Members.

58.    ATI set the work schedules for Plaintiff and the Class Members, which included a 12 hour day 7 days per week at its facilities, and ATI signed off on employee timesheets before they were submitted.

59.    ATI and Strom supervisors were stationed onsite at the ATI plants and observed Plaintiff's and the Class Members' work activities.

60.    ATI and Strom supervisors instructed and trained Plaintiff and the Class Members in how to perform their job duties.

61.    ATI and Strom supervisors had the authority to hire and fire Plaintiff and the Class Members.

62.    Strom issued Plaintiff's and Class Members' paystubs, but was paid by ATI for the work performed by Plaintiff and Class Members.

63.    Plaintiff worked as an hourly non-exempt worker in the job title of train operator for Defendants between approximately August 2015 and March 2016.

64.    Plaintiff and Class Members are not unionized workers.

65.    Plaintiff and Class Members were paid hourly and were provided a *per diem*.

13

66.     The Pennsylvania Minimum Wage Act of 1968 ("PMWA") requires that "[e]very employer shall pay . . . each of his or her employe[es] wages for all hours worked." 43 Pa. Cons. Stat. § 333.104(a).

67.     Travel time is compensable under the PMWA when the "time spent in traveling as part of the duties of the employee during normal working hours and time during which an employee is employed or permitted to work." 34 Pa. Code § 231.1 (1994).

68.     As part of their employment, Defendants required Plaintiff and the Class Members to stay overnight at a particular location, either at a particular hotel or a specific geographic area, and to begin their work day by meeting at a central location outside of the plant early in the morning.

69.     It was part of Plaintiff and the Class Members' expected duties to travel from the central location where Plaintiff and Class Members were picked up in the assigned vans to the ATI location.

70.     Plaintiff and Class Members were required to get themselves to the central location assigned by Strom so that they could then ride together in assigned vans that were provided by Strom to ATI's locked-out manufacturing plants. This policy provided a direct benefit to Defendants as it ensured that no unauthorized individuals, such as the USW workers, entered the facilities.

71.     Plaintiff and Class Members were required to carry identification cards that they received from Defendants to ensure that only the replacement workforce that had been cleared by Defendants to enter the ATI plants were able to do so.

72.     Plaintiff and Class Members were also often required to store mandatory personal protective equipment ("PPE") provided by Defendants with them at their hotels and to transport

14

the PPE to and from the worksite in the vans that were provided by Defendants. This PPE included some or all of the following: hard hats, metatarsal boots, safety glasses, gloves, and various heat and tear resistant clothing.

73.    Plaintiff and Class Members were also required to ride in the assigned vans back to their assigned central location to conclude their workday.

74.    Defendants controlled the manner and method of Plaintiff and Class Members being transported from the central meeting location to and from the actual work sites.

75.    Plaintiff and the Class Members were expected to follow Strom's procedures in traveling to and safely crossing the picket lines, including entering the plant, which generally took between forty-five minutes to an hour or more, each way.

76.    This time resulted in approximately 1 hour to 2 hours of unpaid time for each worker each day during the lockout. As the workers typically worked seven days a week, this resulted in approximately 7 to 17.5 hours of unpaid time each week.

77.    Specifically, Plaintiff's and Class Members' work schedule typically consisted of assembling in a central location assigned by Strom approximately ten to fifteen minutes before the vans left and signing into a sign-in sheet at that time that was maintained by Defendants, driving or riding the Strom vans to the ATI plant, assembling at the plant approximately five to fifteen minutes before the start of their shift, working at the ATI plant for 12 hours per day, assembling at the vans at the end of their shift, and driving or riding the Strom vans back to the central location where Defendants had instructed and assigned Plaintiff and Class Members to stay overnight.

78.    ATI and Strom's purpose behind requiring Plaintiff and Class Members to travel in Strom vans was to safely transport them past the USW picket lines and to their ATI worksites, in

order to pressure the USW into accepting ATI's labor bargaining demands while maintaining ATI's business operations.

79.     From the start of their assignments, Plaintiff and Class Members were instructed by Strom at the direction of ATI that they were prohibited from driving their own vehicles to and from the ATI facilities for as long as there was an active union dispute. Plaintiff and Class Members were told that they were required to travel to the ATI facilities in vans due to safety issues involved with crossing the picket lines.

80.     Accordingly, Plaintiff's and Class Members' employment with ATI and Strom required that as part of their job duties, they cross active picket lines in the vans owned, leased, or rented by Strom with the expenses of the vans underwritten through Strom's contract with ATI.

81.     These situations were often hostile and had the potential to be dangerous. They included situations in which individuals would cross back and forth in front of the vans to slow and hinder their process, loudly yell obscenities and slurs at Plaintiff and Class Members, physically rock the van with the replacement workers inside, attempt to open the van doors, hit the vehicles with picket signs or other foreign objects, attempt to puncture the vehicles' tires or scratch the vehicles, and film Plaintiff and Class Members as they sat in the vans.

82.     Strom also provided ATI with security to assist in safely transporting Plaintiff and Class Members to and across the picket lines.

83.     Defendants conducted orientations for Plaintiff and Class Members prior to their beginning work at the ATI plants, which explicitly included instructions about how to properly perform their jobs while crossing the picket lines. For example, during orientations for the replacement workers, Plaintiff was instructed not to respond to or engage with the individuals on the picket line.

84.     Plaintiff and Class Members followed Defendant's instructions as a term and condition of their employment.

85.     In order to not have to pay additional drivers, Defendants typically required Plaintiff or other replacement workers to drive the vans. For example, Plaintiff was originally assigned to be a van driver and he drove a van full of replacement workers to and from the ATI facility until he was switched to a different shift for which there was already an assigned van driver.

86.     All of this work, including the time driving or traveling in a company van, and the attendant associated time spent waiting and crossing picket lines to get into the facility, whether the Plaintiff and Class Members were driving the vans or not, was unpaid.

87.     The successful and safe transportation of Plaintiff and Class Members was the primary purpose of the engagement between ATI and Strom, and enabled ATI to continue its operations, thereby putting significant downward pressure on the USW to accept ATI's terms with respect to contract negotiations.

88.     Defendants do not maintain accurate records of the actual hours that Plaintiff and the Class Members worked each workday and the total hours worked each workweek.

89.     Defendants knew or should have known that the work that they required of Plaintiff and Class Members in transportation to the facility and across the picket lines and associated work should be compensated under Pennsylvania law.

90.     Defendants are sophisticated national and multi-national businesses with access to knowledgeable human resource specialists and competent labor counsel.

91.     Defendants have acted willfully and with reckless disregard of clearly applicable Pennsylvania state law wage and hour provisions by failing to compensate Plaintiff and Class Members for all hours worked in excess of forty (40) during the workweek, and benefitting from

17

the replacement labor that they obtained in order to continue to maintain ATI's operations without properly compensating Plaintiff and Class Members for this work.

92.   Strom profited from the work performed by Plaintiff and Class Members and was paid by ATI for providing the services rendered by Plaintiff and Class Members.

93.   If Strom and/or ATI were forced to compensate Plaintiff and Class Members for the work spent for transportation to and across the picket lines, Strom would have made less money, and ATI might have been more inclined to enter into more favorable negotiations with the USW to end the lockout sooner. Both companies benefitted from the uncompensated labor of Plaintiff and Class Members as described in this Complaint.

## CLASS ACTION ALLEGATIONS

94.   Pennsylvania has a strong public policy favoring class actions.

95.   Pursuant to Pa. R. Civ. P. 1702, Plaintiff Smith asserts all causes of action set forth below individually and on behalf of the Pennsylvania Class as defined above.

96.   The members of each of the Pennsylvania Class are so numerous that joinder of all members is impracticable. The Pennsylvania Class includes at least forty (40) members.

97.   Plaintiff will fairly and adequately represent and protect the interests of the Pennsylvania Class because there is no conflict between his claims and those of the Pennsylvania Class, and Plaintiff's claims are typical of the claims of the Pennsylvania Class.

98.   There are questions of law and fact common to the proposed Pennsylvania Class, which predominate over any questions affecting only individual Class members, including, without limitation: whether Defendants have violated and continue to violate Pennsylvania law through their policies or practices of not paying their non-exempt workforce for all hours worked and overtime compensation. Defendants did not pay Plaintiff and the Pennsylvania Class for any

time spent reporting at the central assigned location transport site, driving or being driven to ATI's facilities, crossing the picket line, and arriving at the job site, even though this work was integral and indispensable to the replacement work that ATI contracted with Strom to provide in order to increase pressure on the USW during the pendency of the lockout.

99.    Plaintiff asserts claims that are typical of the claims of the Pennsylvania Class in the following ways, without limitation: (a) Plaintiff is a member of the Pennsylvania Class; (b) Plaintiff's claims arise out of the same policies, practices and course of conduct that form the basis of the claims of the Pennsylvania Class; (c) Plaintiff's claims are based on the same legal and remedial theories as those of the Pennsylvania Class and involve similar factual circumstances; (d) there are no conflicts between the interests of Plaintiff and the Pennsylvania Class Members; and (e) the injuries suffered by Plaintiff are similar to the injuries suffered by the Pennsylvania Class members.

100.    Plaintiff will fairly and adequately assert and protect the interests of the Class members that he seeks to represent pursuant to the criteria set forth in Pa. R. Civ. P. 1709. Specifically:

        a.     Plaintiff has retained counsel experienced in the prosecution of complex litigation, including wage and hour class action claims;

        b.     Plaintiff has no conflict of interest in the maintenance of the class action; and

        c.     Plaintiff through his undersigned counsel have adequate financial resources to assure that the interests of the Class will be protected and will not be harmed.

101.    A class action provides a fair and efficient method for adjudication of the controversy under the criteria set forth in Pa. R. Civ. P. 1708. Specifically:

    a.    Common questions of law or fact predominate over any question affecting only individual members;

    b.    Were individual Class members required to bring separate actions, this Court would be confronted with a multiplicity of lawsuits burdening the court system while also creating the risk of inconsistent rulings and contradictory judgments;

    c.    Adjudications with respect to individual members of the Class could as a practical matter be dispositive of the interests of other members not parties to the adjudications or substantially impair or impede their ability to protect their interests;

    d.    A class action presents far fewer management difficulties while providing unitary adjudication, economies of scale and comprehensive supervision by a single court;

    e.    Plaintiff is not aware of any litigation already commenced by members of the Class involving any of the same issues; and

    f.    This forum is appropriate for the litigation of the claims of the entire Class, which is where the events giving rise to the claims took place.

102.    Without a class action, Defendants will retain the benefit of their wrongdoing, which will result in further damages to Plaintiff and the Pennsylvania Class. Plaintiff envisions no difficulty in the management of this action as a class action.

20

## COUNT I
### Violation of the Pennsylvania Minimum Wage Act
### (On behalf of the Pennsylvania Class)

103.    All previous paragraphs are incorporated as though fully set forth herein.

104.    The PMWA requires that covered employees be compensated for all hours worked.

105.    The PMWA also requires that covered employees be compensated for all hours worked in excess of forty (40) hours per week at a rate not less than one and one-half (1 ½) times the regular rate at which he is employed.

106.    Defendants are subject to the overtime requirements of the PMWA because they are employers under 43 P.S. § 333.103(g).

107.    During all relevant times, Plaintiff and the Pennsylvania Class were covered employees entitled to the above-described PMWA's protections. *See* 43 P.S. § 333.103(h).

108.    Defendants failed to compensate Plaintiff and the Pennsylvania Class at a rate of one and one-half (1 ½) times their regular hourly wage for hours worked in excess of forty (40) hours per week.

109.    Pursuant to 43 P.S. § 333.113, employers, such as Defendants, who fail to pay an employee wages in conformance with the PMWA shall be liable to the employee for the wages or expenses that were not paid, court costs and attorneys' fees incurred in recovering the unpaid wages.

## COUNT II
### Unjust Enrichment
### (On Behalf of the Pennsylvania Class)

110.    All previous paragraphs are incorporated as though fully set forth herein.

111.    Defendants have received and benefited from the uncompensated labors of Plaintiff and the Pennsylvania Class, such that to retain said benefit without compensation would be inequitable and rise to the level of unjust enrichment.

112.    At all relevant times hereto, Defendants devised and implemented a plan to increase its earnings and profits by fostering a scheme of securing work from Plaintiff and the Pennsylvania Class without properly paying compensation for all hours worked, including overtime compensation.

113.    Specifically, ATI and Strom knew that one of the principal activities that Plaintiff and the Pennsylvania Class would perform for them would be traveling across the picket lines in order for ATI to continue its operations during the pendency of the lockout. Strom and ATI could likely not have obtained a replacement workforce with local labor because of the stigma associated with crossing a picket line. They therefore found workers who needed to support their families from outside of the local community and induced them to work with relatively high hourly wages, and made arrangements to get them safely into ATI's facilities. Despite the fact that this work was an expected duty and conducted during Plaintiff and the Class Members' normal work day, neither ATI nor Strom compensated Plaintiff and Pennsylvania Class Members for this work, saving ATI millions of dollars, and increasing Strom's profitability for the job.

114.    Contrary to all good faith and fair dealing, Defendants induced Plaintiff and the Pennsylvania Class to perform work while failing to properly compensate for all hours worked as required by law, including overtime compensation.

115.    By reason of having secured the work and efforts of Plaintiff and the Pennsylvania Class without proper compensation as required by law, Defendants enjoyed reduced overhead with respect to its labor costs, and therefore realized additional earnings and profits to its own benefit

22

and to the detriment of Plaintiff and the Pennsylvania Class. Defendants retained and continue to

retain such benefits contrary to the fundamental principles of justice, equity, and good conscience.

116.    Accordingly, Plaintiff and the Pennsylvania Class are entitled to judgment in an

amount equal to the benefits unjustly retained by Defendants.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff seeks the following relief on behalf of himself and all others

similarly situated:

a.    An order permitting this litigation to proceed as a class action pursuant to Fed. R
Civ. P. 23 on behalf of the Pennsylvania Class;

b.    Back pay damages (including unpaid overtime compensation, unpaid spread of
hours payments and unpaid wages) and prejudgment interest to the fullest extent
permitted under the law;

c.    Liquidated damages to the fullest extent permitted under the law;

d.    Litigation costs, expenses, and attorneys' fees to the fullest extent permitted under
the law; and

e.    Such other and further relief as this Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury for all issues of fact.

Dated: February 6, 2019                    Respectfully submitted,


By:   /s/Joseph H. Chivers
      Joseph H. Chivers (PA 39184)
      THE EMPLOYMENT RIGHTS GROUP
      100 First Avenue, Suite 650
      Pittsburgh, PA  15222
      Tel.:  (412) 227-0763
      jchivers@employmentrightsgroup.com

      Shanon J. Carson (PA 85957)
      Sarah R. Schalman-Bergen (PA 206211)
      Alexandra Piazza (PA 315240)

23

Michaela Wallin (*pro hac vice forthcoming*)
BERGER MONTAGUE PC
1818 Market St., Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-3053
Facsimile: (215) 875-4604
scarson@bm.net
sschalman-bergen@bm.net
apiazza@bm.net
mwallin@bm.net

Michael K. Yarnoff  (PA 62222)
KEHOE LAW FIRM
Two Penn Center Plaza
1500 JFK Boulevard, Suite 1020
Philadelphia, PA 19102
Telephone/Fax: (215) 792-6676
myarnoff@kehoelawfirm.com

DocuSign Envelope ID: CE5C755D-8110-471B-9842-B9AF63413D83

## VERTIFICATION

The undersigned, RALPH SMITH, herein avers that the statements of fact contained in the foregoing CLASS ACTION COMPLAINT are true and correct to the best of his information, knowledge, and belief, and are made subject to penalties of 19 Pa. C.S.A. Sec. 4904 relating to unsworn falsification to authorities.

Date: ___2/4/2019___

DocuSigned by:

*Ralph Smith*

7DA557C0F7C94E5...

Ralph Smith

# Supreme Court of Pennsylvania
## Court of Common Pleas
## Civil Cover Sheet
Allegheny **County**

| | |
|---|---|
| *For Prothonotary Use Only:* | |
| Docket No: | |

*The information collected on this form is used solely for court administration purposes. This form does not supplement or replace the filing and service of pleadings or other papers as required by law or rules of court.*

**S E C T I O N   A**

**Commencement of Action:**
- ☒ Complaint
- ☐ Writ of Summons
- ☐ Petition
- ☐ Transfer from Another Jurisdiction
- ☐ Declaration of Taking

| Lead Plaintiff's Name: Ralph Smith | Lead Defendant's Name: Allegheny Technologies, Inc. |
|---|---|

| Are money damages requested? ☒ Yes ☐ No | Dollar Amount Requested: (check one) | ☐ within arbitration limits ☒ outside arbitration limits |
|---|---|---|

| Is this a *Class Action Suit?* ☒ Yes ☐ No | Is this an *MDJ Appeal?* ☐ Yes ☒ No |
|---|---|

Name of Plaintiff/Appellant's Attorney: __The Employment Rights Group, LLC; Berger Montague PC; Kehoe Law Firm__

☐ **Check here if you have no attorney (are a Self-Represented [Pro Se] Litigant)**

**Nature of the Case:** Place an "X" to the left of the **ONE** case category that most accurately describes your **PRIMARY CASE.** If you are making more than one type of claim, check the one that you consider most important.

**S E C T I O N   B**

**TORT** *(do not include Mass Tort)*
- ☐ Intentional
- ☐ Malicious Prosecution
- ☐ Motor Vehicle
- ☐ Nuisance
- ☐ Premises Liability
- ☐ Product Liability *(does not include mass tort)*
- ☐ Slander/Libel/ Defamation
- ☐ Other: _____

**MASS TORT**
- ☐ Asbestos
- ☐ Tobacco
- ☐ Toxic Tort - DES
- ☐ Toxic Tort - Implant
- ☐ Toxic Waste
- ☐ Other: _____

**PROFESSIONAL LIABLITY**
- ☐ Dental
- ☐ Legal
- ☐ Medical
- ☐ Other Professional: _____

**CONTRACT** *(do not include Judgments)*
- ☐ Buyer Plaintiff
- ☐ Debt Collection: Credit Card
- ☐ Debt Collection: Other
  _____
  _____
- ☐ Employment Dispute: Discrimination
- ☒ Employment Dispute: Other
  __Class Action - Overtime__
  _____
- ☐ Other: _____
  _____

**REAL PROPERTY**
- ☐ Ejectment
- ☐ Eminent Domain/Condemnation
- ☐ Ground Rent
- ☐ Landlord/Tenant Dispute
- ☐ Mortgage Foreclosure: Residential
- ☐ Mortgage Foreclosure: Commercial
- ☐ Partition
- ☐ Quiet Title
- ☐ Other: _____

**CIVIL APPEALS**
Administrative Agencies
- ☐ Board of Assessment
- ☐ Board of Elections
- ☐ Dept. of Transportation
- ☐ Statutory Appeal: Other
  _____
  _____
- ☐ Zoning Board
- ☐ Other: _____
  _____

**MISCELLANEOUS**
- ☐ Common Law/Statutory Arbitration
- ☐ Declaratory Judgment
- ☐ Mandamus
- ☐ Non-Domestic Relations Restraining Order
- ☐ Quo Warranto
- ☐ Replevin
- ☐ Other: _____
  _____

*Updated 1/1/2011*