## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **RALPH SMITH, individually and on behalf** | : | |
| **of all persons similarly situated,** | : | |
| | : | **Civil Action No.: 2:19-CV-00147-MRH** |
| | : | |
| **Plaintiff,** | : | |
| | : | **AMENDED CLASS ACTION** |
| **v.** | : | **COMPLAINT** |
| | : | |
| **STROM ENGINEERING** | : | **JURY TRIAL DEMANDED** |
| **CORPORATION,** | : | |
| | : | **ELECTRONICALLY FILED** |
| **Defendant.** | : | **DOCUMENT** |
| | : | |

Plaintiff Ralph Smith ("Plaintiff"), individually and on behalf of all others similarly situated, files this Amended Class Action Complaint ("Complaint") against Defendant Strom Engineering Corporation ("Defendant" or "Strom"), seeking all available relief under Pennsylvania law. Plaintiff alleges the following based upon personal knowledge as to his own acts, and based upon the investigation conducted by his counsel, as to all other allegations.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332.

2.      Venue is proper because the claims herein occurred in whole or part in this jurisdiction.

## PARTIES

3.      Plaintiff Ralph Smith is an individual currently residing in North Carolina. He was hired by Strom to serve as part of the replacement workforce during Allegheny Technologies, Inc. ("ATI") lockout of its unionized workers, the United Steel, Paper, and Forestry, Rubber, Manufacturing Energy Allied Industrial and Service Workers International Union, AFL-CIO, CLC ("USW"). Plaintiff was employed by Strom at ATI's Brackenridge, Pennsylvania facility (the

"Brackenridge ATI Plant") as a non-exempt hourly worker from approximately August 2015 through March 2016.

4.      Defendant Strom Engineering Corporation ("Strom") is a Minnesota corporation headquartered in Minnetonka, Minnesota. Strom provides replacement labor staffing for employers involved in labor disputes across the United States, including for ATI in this judicial district.

## CLASS ACTION DEFINITION

5.      Plaintiff brings this lawsuit as a class action pursuant to Fed. R. Civ. P. 23, on behalf of himself and the following class:

> All current or former hourly employees who were provided by Strom as a replacement labor force and who performed work at any ATI facility in Pennsylvania (Bagdad, Brackenridge, Latrobe, Midland, Natrona Heights, Vandergrift and/or Washington) during the August 15, 2015 to March 4, 2016 lockout and labor dispute between ATI and the USW (the "Pennsylvania Class").

6.      Plaintiff reserves the right to redefine the Pennsylvania Class prior to class certification, and thereafter, as necessary.

## FACTUAL ALLEGATIONS

**A.    BACKGROUND**

7.      Strom, a privately-held corporation, provides staffing in the form of strike and lockout replacement labor for unionized employers at locations throughout the United States.

8.      Employers' increasing use of temporary workers and hostility towards labor unions have been a feature of the modern labor market since the 1970s. Agencies like Strom, that specialize in strike staffing (including staffing during a lockout) represent an emerging force that

capitalize on the ample supply of individuals who have been pushed to operate within a temporary, informal workforce, and use these individuals as a weapon against organized labor.[1]

9.     In doing so, these strike-busting agencies and the companies that hire them not only exert downward pressure on working standards, benefits, and conditions for workers in general, but do so on the backs of temporary workers who are uniquely vulnerable to exploitation and limited in their ability to organize or advocate for their rights.[2]

10.    Although there has been a long history of employers hiring replacement workers to oppose union organizing, the scale of worker replacement afforded by strike-busting agencies like Strom takes this anti-union tool to an entirely new level.[3] Strike-busting agencies are able to mobilize hundreds or thousands of skilled or semi-skilled workers with little to no notice, lowering the hurdles for employers taking hardline stands against union demands and eliminating any negative implications to a company's productivity.

11.    These features are central to the services Strom offers, which are advertised as calling upon a "30,000+ employee database to identify Strom employees with project-relevant experience," "eliminat[ing] the lead-time generally associated with the activation of temporary replacement workers", and ensuring that Strom demonstrates "to union leaders that direct action is being taken to make sure all company obligations are met without exception." http://www.stromengineering.com/staffing/strike-staffing (last accessed February 4, 2019).

12.    Strom bills itself as offering "unparalleled experience" in aiding employers through a labor dispute:

---

[1] *See generally* Erin Hatton, *Temporary Weapons: Employers' Use of Temps against Organized Labor*, 67(1) Cornell I.L.R. 86 (2014).
[2] *Id.* at 105-06.
[3] *Id.* at 91.

> If your business is facing a potential labor disruption, we can help you minimize the possible repercussions. Strom offers a five-phase approach for providing strike replacement staffing during a labor disruption situation: assessments, recruiting, pre-deployment, deployment, and disbandment. **When you utilize our comprehensive industrial strike staffing services, we will determine your business's unique needs, locate, accommodate, and train qualified workers,** *secure safe transportation across picket lines***, and follow the appropriate protocol for strike staffing disbandment after a new labor contract has been approved**. Strom offers unparalleled experience developing comprehensive business continuity plans, custom-tailored to meet each client's specific needs.

https://www.stromengineering.com/staffing/strike-staffing (last accessed February 4, 2019) (emphasis added).

13.     Touting its position as "the nation's most reputable industrial strike staffing company" with over "55 years of experience in labor staffing and 25 years of experience providing strike staffing," Strom's promotional statements hint at the larger historical context within which Strom's activities and those of the companies with whom it contracts should be understood. http://www.stromengineering.com/about/about-strom (last accessed February 4, 2019).

14.     Strom's business pits working people against each other. "Their business is pain and misery for working people," an official of the Bakery, Confectionary, Tobacco Workers and Grain Millers Union was quoted in a local newspaper as saying. "They're just a misery machine."[4]

15.     Meanwhile, the structure of strike-busting agencies' employment of replacement workers places those workers in a uniquely precarious position that makes it nearly impossible for them to organize and advocate for their own labor rights.[5]

---

[4] *See* Len Boselovic, *Embattled unions resent Strom replacement workers,* Pittsburgh Post Gazette (Aug. 23, 2015), *available at* http://www.post-gazette.com/business/pittsburgh-company-news/2015/08/23/Stroms-replacement-workers-often-displace-union-force-Allegheny-Technologies/stories/201508210104.

[5] *See* Erin Hatton, *Temporary Weapons: Employers' Use of Temps against Organized Labor*, 67(1) Cornell I.L.R. 86, 105-06 (2014).

16.     While strike-busting agencies employ thousands of replacement workers, these workers do not work together consistently but are sent from workplace to workplace, isolated from both their replacement and union counterparts and thus limited in their ability to organize and advocate for themselves.

17.     Even if they are stationed at one worksite for an extended period, few replacement workers can risk engaging in union activities or other advocacy because they could immediately lose their current job as well as any future assignments by being identified as trouble-makers. As such, the structural ambiguity of temporary employment places logistical limitations on traditional labor protections.

18.     With neither job security, the ability to organize, nor ready access to traditional labor protections, replacement workers are extremely vulnerable. They are at the mercy of the strike-busting agencies and companies whose priorities center on ensuring continuity in their own operations, frequently at the expense of the work conditions and basic rights of the replacement workers that make this possible.

**B.      STROM EMPLOYED PLAINTIFF AND THE CLASS MEMBERS TO SERVE AS STRIKE BUSTERS**

19.     From approximately August 15, 2015 to March 4, 2016, ATI instituted a lockout of its USW union workforce in order to gain an advantage in its contract negotiations with the USW.

20.     In response to the lockout, the USW mobilized its members to protest ATI's decision. Relevant to this case, these protests included picket lines and rallying at plant gates.[6]

---

[6] *See* United Steel Workers, *Picket Lines are Strong in All Locations as ULP Lockout at ATI Rolls Into Second Week* (August 22, 2015), *available at* https://www.usw.org/news/media-center/articles/2015/picket-lines-are-strong-in-all-locations-as-ulp-lockout-at-ati-rolls-into-second-week.

21.     Picketing is a form of protest whose aims are to put public pressure on the business through attempting to prevent replacement workers from entering the site and providing publicity to the issue being protested.

22.     Hundreds of unionized USW workers marched to and around ATI's plant gates to protest the lockout.

23.     Throughout the lockout, USW members held picket lines at ATI's affected plants. At least one picket line, in Bagdad, Pennsylvania, just before Christmas, even continued in the midst of a snowstorm.

24.     For example, the picture below[7] was posted on the USW website during the lockout:



25.     ATI contracted with Strom to provide strike staffing during the pendency of the lockout.

26.     The Strom-provided temporary workforce was hired to put pressure on the USW to accept ATI's demands and cross the picket lines while keeping ATI's operations running.

27.     Strom typically hires workers who are not from the local community where the lockout occurs, and who are in need of hourly work to support themselves and their families.

---

[7] *Id.*

28.     These temporary workers, including Plaintiff and Class Members, are brought in by Strom to the geographic area at issue and housed at local hotels and motels away from their families and communities during the pendency of the work assignment.

29.     The temporary workers, including Plaintiff and Class Members, worked long hours to travel to and from the ATI facilities and keep production up during the lockout.

30.     Strom paid Plaintiff and the Pennsylvania Class Members on an hourly basis.

31.     Strom was well aware of the importance of providing the temporary workforce with safe and coordinated entrance through the USW picket lines and into ATI's facilities as a way to undermine the USW's negotiating power.

32.     For example, a job posting identified as being posted by ATI and/or Strom on Craigslist, a classified advertisement website, explicitly specified that the primary purpose of the employment was to address what was emphasized as "A LABOR DISPUTE SITUATION" in which "EMPLOYEES WILL BE TRANSPORTED ACROSS A PICKET LINE."[8]

---

[8] *Id.* (quoting craigslist advertisement) (emphasis in original).



33.     Notwithstanding the importance of the transport of the temporary workforce to and across picket lines -- indeed, Strom's entire business model is built on and premised on it -- Strom did not provide any compensation to Plaintiff and Class Members for these activities.

**D.      WORK PERFORMED BY PLAINTIFF AND THE CLASS MEMBERS**

34.     Strom hired Plaintiff and the Pennsylvania Class Members to cross the USW picket line and replace one or more individuals in ATI's union workforce throughout the pendency of the lockout.

35.     The work that Plaintiff and Class Members performed, including traveling to and across picket lines, was performed at Strom's direction.

36.     Specifically, Strom incurred a benefit from this work, because it was being paid by ATI for its services in providing the temporary workforce during the lockout, including to transport replacement workers across picket lines.

37.     Strom controlled Plaintiff's work and the work of the Pennsylvania Class Members.

38.     Strom supervisors were stationed onsite at the ATI plants and observed Plaintiff's and the Class Members' work activities.

39.     Strom supervisors instructed and trained Plaintiff and the Class Members in how to perform their job duties, including how to travel to and cross the USW picket lines.

40.     Plaintiff worked as an hourly non-exempt worker for Strom between approximately August 2015 and March 2016.

41.     Plaintiff and Class Members are not unionized workers.

42.     Plaintiff and Class Members were paid hourly and were provided a *per diem*.

43.     The Pennsylvania Minimum Wage Act of 1968 ("PMWA") requires that "[e]very employer shall pay . . . each of his or her employe[es] wages for all hours worked." 43 Pa. Cons. Stat. § 333.104(a).

44.     Travel time is compensable under the PMWA when the "time spent in traveling as part of the duties of the employee during normal working hours and time during which an employee is employed or permitted to work." 34 Pa. Code § 231.1 (1994).

45.     As part of their employment, Strom required Plaintiff and the Class Members to stay overnight at a particular location, either at a particular hotel or a specific geographic area, and to begin their work day by meeting at a central location outside of the plant early in the morning.

46.     It was part of Plaintiff and the Class Members' expected duties to travel from the central location where Plaintiff and Class Members were picked up in the assigned vans to the ATI location.

47.     Plaintiff and Class Members were required to get themselves to the central location assigned by Strom so that they could then ride together in assigned vans that were provided by Strom to ATI's locked-out manufacturing plants.

48.     Plaintiff and Class Members were required to carry identification cards that they received from Strom and ATI to ensure that only the replacement workforce that had been cleared by Strom and ATI to enter the ATI plants were able to do so.

49.     Plaintiff and Class Members were also often required to store mandatory personal protective equipment ("PPE") provided by Strom and ATI with them at their hotels and to transport the PPE to and from the worksite in the vans that were provided by Strom. This PPE included some or all of the following: hard hats, metatarsal boots, safety glasses, gloves, and various heat and tear resistant clothing.

50.     Plaintiff and Class Members were also required by Strom to ride in the assigned vans back to their assigned central location to conclude their workday.

51.     Strom controlled the manner and method of Plaintiff and Class Members being transported from the central meeting location to and from the actual work sites.

52.     Plaintiff and the Class Members were expected to follow Strom's procedures in traveling to and safely crossing the picket lines, including entering the plant, which generally took between forty-five minutes to an hour or more, each way.

53.     This time resulted in approximately 1 hour to 2 hours of unpaid time for each worker each day during the lockout. As the workers typically worked seven days a week, this resulted in approximately 7 to 17.5 hours of unpaid overtime each week.

54.     Specifically, Plaintiff's and Class Members' work schedule typically consisted of assembling in a central location assigned by Strom approximately ten to fifteen minutes before the vans left and signing into a sign-in sheet at that time, driving or riding the Strom vans to the ATI plant, assembling at the plant approximately five to fifteen minutes before the start of their shift, working at the ATI plant for 12 hours per day, assembling at the vans at the end of their shift, and

driving or riding the Strom vans back to the central location where Strom had instructed and assigned Plaintiff and Class Members to stay overnight.

55.     Strom's purpose behind requiring Plaintiff and Class Members to travel in Strom vans was to safely transport them past the USW picket lines and to their ATI worksites, in order to pressure the USW into accepting ATI's labor bargaining demands while maintaining ATI's business operations.

56.     From the start of their assignments, Plaintiff and Class Members were instructed by Strom that they were prohibited from driving their own vehicles to and from the ATI facilities for as long as there was an active union dispute. Plaintiff and Class Members were told that they were required to travel to the ATI facilities in vans due to safety issues involved with crossing the picket lines.

57.     Accordingly, Plaintiff's and Class Members' employment with Strom required that as part of their job duties, they cross active picket lines in the vans owned, leased, or rented by Strom with the expenses of the vans underwritten through Strom's agreement with ATI.

58.     Interactions that occurred in crossing the picket lines were often hostile and had the potential to be dangerous. They included situations in which individuals would cross back and forth in front of the vans to slow and hinder their process, loudly yell obscenities and slurs at Plaintiff and Class Members, physically rock the van with the replacement workers inside, attempt to open the van doors, hit the vehicles with picket signs or other foreign objects, attempt to puncture the vehicles' tires or scratch the vehicles, and film Plaintiff and Class Members as they sat in the vans.

59.     Strom also provided ATI with security to assist in safely transporting Plaintiff and Class Members to and across the picket lines.

60.     Strom conducted orientations for Plaintiff and Class Members prior to their beginning work at the ATI plants, which explicitly included instructions about how to properly perform their jobs while crossing the picket lines. For example, during orientations for the replacement workers, Plaintiff was instructed not to respond to or engage with the individuals on the picket line.

61.     Plaintiff and Class Members followed Strom's instructions as a term and condition of their employment.

62.     In order maximize its revenue by avoiding hiring additional drivers, Strom typically required Plaintiff or other replacement workers to drive the vans.

63.     Plaintiff was originally assigned to be a van driver and, as part of his required duties, he drove a van full of replacement workers to and from the ATI facility until he was switched to a different shift for which there was already an assigned van driver.

64.     All of this work, including the time driving or traveling in a company van, and the attendant associated time spent waiting and crossing picket lines to get into the facility, whether the Plaintiff and Class Members were driving the vans or not, was unpaid.

65.     The successful and safe transportation of Plaintiff and Class Members was the primary purpose of Strom's business offerings to ATI and similar clients.

66.     Strom does not maintain accurate records of the actual hours that Plaintiff and the Class Members worked each workday and the total hours worked each workweek.

## CLASS ACTION ALLEGATIONS

67.     Plaintiff brings this action as a class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the Pennsylvania Class defined above.

68.     The members of each of the Pennsylvania Class are so numerous that joinder of all members is impracticable. The Pennsylvania Class includes over 500 members.

69.     Plaintiff will fairly and adequately represent and protect the interests of the Pennsylvania Class because there is no conflict between his claims and those of the Pennsylvania Class, and Plaintiff's claims are typical of the claims of the Pennsylvania Class.

70.     Plaintiffs' counsel are competent and experienced in litigating class actions and other complex litigation matters, including wage and hour cases like this one.

71.     There are questions of law and fact common to the proposed Pennsylvania Class, which predominate over any questions affecting only individual Class members, including, without limitation: whether Strom has violated Pennsylvania law through its policies or practices of not paying its non-exempt workforce for all hours worked and overtime compensation. Strom did not pay Plaintiff and the Pennsylvania Class for any time spent reporting at the central assigned location transport site, driving or being driven to ATI's facilities, crossing the picket line, and arriving at the job site, even though this work was the primary reason that Strom contracted with ATI to provide replacement workers during the pendency of the lockout.

72.     Plaintiff asserts claims that are typical of the claims of the Pennsylvania Class in the following ways, without limitation: (a) Plaintiff is a member of the Pennsylvania Class; (b) Plaintiff's claims arise out of the same policies, practices and course of conduct that form the basis of the claims of the Pennsylvania Class; (c) Plaintiff's claims are based on the same legal and remedial theories as those of the Pennsylvania Class and involve similar factual circumstances; (d) there are no conflicts between the interests of Plaintiff and the Pennsylvania Class Members; and (e) the injuries suffered by Plaintiff are similar to the injuries suffered by the Pennsylvania Class members.

73.    Class certification is appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Pennsylvania Class respectively predominate over any questions affecting only individual Class members, including, without limitation: whether Strom violated Pennsylvania law through its policies or practices of not paying its non-exempt workforce for all hours worked and overtime compensation. Defendant uniformly failed to pay Plaintiff and Class Members for the time alleged, and the resolution of this issue will resolve liability.

74.    Class action treatment is superior to the alternatives for the fair and efficient adjudication of the controversies alleged herein. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would entail. No difficulties are likely to be encountered in the management of this class action that would preclude its maintenance as a class action, and no superior alternative exists for the fair and efficient adjudication of this controversy. The Pennsylvania Class is readily identifiable from Strom's own employment records. Prosecution of separate actions by individual members of the Pennsylvania would create the risk of inconsistent or varying adjudications with respect to individual Pennsylvania Class members that would establish incompatible standards of conduct for Strom.

75.    Without a class action, Strom will retain the benefit of its wrongdoing, which will result in further damages to Plaintiff and the Pennsylvania Class. Plaintiff envisions no difficulty in the management of this action as a class action.

<u>**COUNT I**</u>
**Violation of the Pennsylvania Minimum Wage Act**
<u>**(On behalf of Plaintiff and the Pennsylvania Class)**</u>

76.    All previous paragraphs are incorporated as though fully set forth herein.

77.    The PMWA requires that covered employees be compensated for all hours worked.

78.     The PMWA also requires that covered employees be compensated for all hours worked in excess of forty (40) hours per week at a rate not less than one and one-half (1 ½) times the regular rate at which he is employed.

79.     Strom is subject to the overtime requirements of the PMWA because it is an employer under 43 P.S. § 333.103(g).

80.     During all relevant times, Plaintiff and the Pennsylvania Class were covered employees entitled to the above-described PMWA's protections. *See* 43 P.S. § 333.103(h).

81.     Strom failed to compensate Plaintiff and the Pennsylvania Class at a rate of one and one-half (1 ½) times their regular hourly wage for hours worked in excess of forty (40) hours per week.

82.     Pursuant to 43 P.S. § 333.113, employers, such as Strom, who fail to pay an employee wages in conformance with the PMWA shall be liable to the employee for the wages or expenses that were not paid, court costs and attorneys' fees incurred in recovering the unpaid wages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff seeks the following relief on behalf of himself and all others similarly situated:

a.      An order permitting this litigation to proceed as a class action pursuant to Fed. R Civ. P. 23 on behalf of the Pennsylvania Class;

b.      Back pay damages (including unpaid overtime compensation, unpaid spread of hours payments and unpaid wages) and prejudgment interest to the fullest extent permitted under the law;

c.      Liquidated damages to the fullest extent permitted under the law;

d.      Litigation costs, expenses, and attorneys' fees to the fullest extent permitted under the law; and

e.      Such other and further relief as this Court deems just and proper.

15

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury for all issues of fact.

Dated: February 25, 2019                    Respectfully submitted,

By:  /s Sarah R. Schalman-Bergen

Shanon J. Carson
Sarah R. Schalman-Bergen
Alexandra K. Piazza
Michaela Wallin*
BERGER MONTAGUE PC
1818 Market St., Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-3053
Facsimile: (215) 875-4604
scarson@bm.net
sschalman-bergen@bm.net
apiazza@bm.net
mwallin@bm.net

Michael K. Yarnoff*
KEHOE LAW FIRM
Two Penn Center Plaza
1500 JFK Boulevard, Suite 1020
Philadelphia, PA 19102
Telephone/Fax: (215) 792-6676
myarnoff@kehoelawfirm.com

Joseph H. Chivers, Esquire
The Employment Rights Group
100 First Avenue, Suite 650
Pittsburgh, Pennsylvania 15222
jchivers@employmentrightsgroup.com

*Attorneys for Plaintiff*

*\*Pro hac vice* to be filed.

## CERTIFICATE OF SERVICE

I hereby certify that on February 25, 2019, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF, and served it by First Class Mail and email on counsel for Defendant Strom Engineering Corporation through its counsel:

Joshua C. Vaughn
Littler Mendelson, P.C.
625 Liberty Ave, 26th Fl.
Pittsburgh, PA 15222
jvaughn@littler.com

/s Sarah R. Schalman-Bergen
Sarah R. Schalman-Bergen