**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **RALPH SMITH, individually and on behalf of all others similarly situated,** | **CIVIL ACTION NO.: 2:19-cv-00147-MRH-PLD** |
| **Plaintiff,** | **CLASS ACTION** |
| **v.** | **ELECTRONICALLY FILED** |
| **STROM ENGINEERING CORPORATION,** | |
| **Defendant.** | |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO STRIKE
THE REPORT AND TESTIMONY OF [DR.] ERIN HATTON, PH.D.**

## <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION ........................................................................................... 1

II.     RELEVANT FACTUAL AND PROCEDURAL BACKGROUND ................................ 5

     A.    Strom Unsuccessfully Tried to Strike Material of the Same Nature It
           Now Seeks To Exclude ..................................................................... 5

     B.    Dr. Hatton's Qualifications .................................................................. 7

     C.    Dr. Hatton's Expert Report .................................................................. 8

     D.    Dr. Hatton's Prior Relevant Research ................................................... 10

III.    LEGAL STANDARD ..................................................................................... 13

IV.     ARGUMENT ............................................................................................... 16

     A.    Dr. Hatton Is Qualified To Offer Expert Testimony ............................... 16

     B.    Dr. Hatton's Expert Testimony is Reliable ........................................... 18

     C.    Dr. Hatton's Expert Testimony Is Helpful to the Jury ........................... 22

V.      CONCLUSION ............................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Berckeley Inv. Grp., Ltd. v. Colkitt*,
  455 F.3d 195 (3d Cir. 2006) ................................................................ 20, 23

*Betterbox Commc'ns Ltd. v. BB Techs., Inc.*,
  300 F.3d 325 (3d Cir. 2002) ................................................................ 14

*Cantor v. Perelman*, No. 97-CV-,
  No. CIVA 97-586 KAJ, 2006 WL 3462596 (D. Del. Nov. 30, 2006) .............................. 20, 21

*Christoforetti v. Bally's Park Place, Inc.*,
  No. 12-4687, 2021 WL 3879074 (D.N.J. Aug. 31, 2021) ...................................... 20

*Curry v. Royal Oak Enterprises, LLC*,
  No. 11-5527, 2013 WL 3196390 (E.D. Pa. June 25, 2013) ................................... 17

*D.B. v. Orange Cty., Fla.*,
  No. 6:13-cv-434-Orl-31DAB, 2014 WL 4655739 (M.D. Fla. Sept. 17, 2014) ................... 18, 22

*Daubert v. Merrell Dow Pharm.*,
  509 U.S. 579 (1993) ....................................................................... 13, 14, 15

*Daubert v Merrell Dow Pharm*,
  43 F3d 1311 (9th Cir 1995) ................................................................ 16

*Dominion Res. SVC, Inc. v. Alstom Power, Inc.*,
  No. 3:16-cv-00544-JCH, 2018 WL 3752878 (D. Conn. Aug. 8, 2018) .......................... 18, 20

*Elcock v. Kmart Corp.*,
  233 F.3d 734 (3d Cir. 2000) .............................................................. 14, 15, 17, 21

*First Nat'l State Bank of N.J. v. Reliance Elec. Co.*,
  668 F.2d 725 (3d Cir. 1981) .............................................................. 20, 23

*Furlan v. Schindler Elevator Corp.*,
  864 F. Supp. 2d 291 (E.D. Pa. 2012) ...................................................... 17

*Gerald v. R.J. Reynolds Tobacco Co.*,
  No. ST-10-cv-631, 2018 WL 4062154 (V.I. Super. Ct. June 12, 2018) ....................... 22

*Grill v. Aversa*,
  No. 1:12-cv-120, 2014 WL 4784150 (M.D. Pa. Sept. 22, 2014) .............................. 20

*Hamilton v. Emerson Elec. Co.*,
  133 F. Supp. 2d 360 (M.D. Pa. 2001) ...................................................... 24

*Holbrook v. Lykes Bros. S.S. Co.*,
  80 F.3d 777 (3d Cir. 1996) ............................................................... 14, 15

*In re Paoli R.R. Yard PCB Litig.*,
  916 F.2d 829 (3d Cir.1990) ............................................................... 14, 15, 16, 22, 23

*In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*,

   13-MD-2445, 2020 WL 6887885 (E.D. Pa. Nov. 24, 2020) ................................................ 22

*In re Suboxone Antitrust Litig.*,
   13-MD-2445, 2021 WL 662292 (E.D. Pa. Feb. 19, 2021) ............................................. 3, 24

*In re TMI Litig.*,
   193 F.3d 613 (3d Cir. 1999) ........................................................................................ 16

*In re: Tylenol (Acetaminophen) Mktg., Sales Practices, and Prods. Liab. Litig.*,
   No. 2:12-cv-07263, 2016 WL 4039286 (E.D. Pa. July 28, 2016) .................................... 23

*Kannankeril v Terminix Int'l*,
   128 F.3d 802 (3d Cir. 1997) ........................................................................................ 18

*Kumho Tire Co., Ltd. v. Carmichael*,
   526 U.S. 137 (1999) ............................................................................................. 13, 15

*Lion Oil Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh*,
   No. 1:13-cv-01071, 2015 WL 11112430 (W.D. Ark. Oct. 20, 2015) ............................ 18, 23

*Ltd. P'ship v. Microsoft Corp.*,
   598 F.3d 831 (Fed. Cir. 2010) .................................................................................... 16

*Nationwide Life Ins. Co. v. Commonwealth Land Title Ins. Co.*,
   No. 05-281, 2011 WL 204619 (E.D. Pa. Jan. 20, 2011) ................................................ 20

*Oddi v. Ford Motor Co.*,
   234 F.3d 136 (3d Cir. 2000) ................................................................................ 15, 20, 21

*Perry v. Schwarzenegger*,
   704 F. Supp. 2d 921 (N.D. Cal. 2010) ......................................................................... 22

*Pineda v. Ford Motor Co.*,
   520 F.3d 237 (3d Cir. 2008) ................................................................................ 3, 13, 14

*Schneider v. Fried*,
   320 F.3d 396 (3d Cir. 2003) ........................................................................................ 14

*Smith v. Allegheny Techs., Inc.*,
   754 Fed. Appx. 136 (3d Cir. 2018) ................................................................................ 5

*Smith v. Strom Eng'g. Corp.*,
   No. 19-147, 2019 WL 12363207 (W.D. Pa. Nov. 14, 2019) ................................... 2, 5, 6, 22

*Stecyk v. Bell Helicopter Textron, Inc.*,
   295 F.3d 408 (3d Cir. 2002) ........................................................................................ 25

*UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*,
   949 F.3d 825 (3d Cir. 2020) ................................................................................. 16, 22

*United States v. Davis*,
   397 F.3d 173 (3d Cir. 2005) .................................................................................. 15, 20

*United States v. Downing*,
   753 F.2d 1224 (3d Cir. 1985) ...................................................................................... 15

*Waldorf v. Shuta*,
   142 F.3d 601 (3d Cir. 1998) ........................................................................................ 14

*Wolfe v. Allstate Prop. & Cas. Ins. Co.*,

No. 4:10-cv-800, 2012 WL 12929813 (M.D. Pa. July 23, 2012)........................................ 17, 20

## Rules

Fed. R. Civ. P. 8(a) ............................................................................................................ 6
Fed. R. Evid. 702 ....................................................................................................... *passim*

## Regulations

U.S. Securities and Exchange Commission, "Temporary Rules to Include Certain "Platform
    Workers" in Compensatory Offerings Under Rule 701 and Form S-8",
    85 FR 79936-01, 2020 WL 7263064 (F.R.) ............................................................. 11
US Dept. of Labor, Wage and Hour Division, Rescission of Joint Employer Status under the Fair
    Labor Standards Act Rule,
    86 FR 14038-01, 2021 WL 929347 (F.R.) ............................................................... 11

## Other Authorities

Howard Becker, *Constructive Typology in the Social Sciences*, 5 AMERICAN SOCIOLOGICAL
    REVIEW 1 (1940).......................................................................................................... 12
David Collier, Jody LaPorte, and Jason Seawright, *Putting Typologies to Work: Concept
    Formation, Measurement, and Analytic Rigor*, POLITICAL RESEARCH QUARTERLY (2012)..... 12
Erin Hatton, *Temporary Weapons: Employers' Use of Temps against Organized Labor*, 67(1)
    CORNELL I.L.R. 86 (2014) .................................................................................... *passim*
ERIN HATTON, THE TEMP ECONOMY: FROM KELLY GIRLS TO PERMATEMPS IN POSTWAR AMERICA
    (2011) ................................................................................................................. 11, 14
ERIN HATTON, COERCED: WORK UNDER THREAT OF PUNISHMENT (2020) ................................. 11
ERIN HATTON, LABOR AND PUNISHMENT: WORK IN AND OUT OF PRISON (2021) ...................... 11
HOWARD LUNE AND BRUCE L. BERG, QUALITATIVE RESEARCH METHODS FOR THE SOCIAL
    SCIENCES (9th Ed. 2017)........................................................................... 11, 12, 13

## I.    INTRODUCTION

This case is about the nature of work, and Strom does not want the trier of fact to learn about the nature of its work or the work of its Replacement Worker employees. Strom operates in the shadowy world of strike staffing. Companies like Strom emerged in the late-1980s as part of a sector of temp agencies that specialized in supplying workers during labor disputes. Ex. 10 Dr. Hatton's [Expert Report] at 3, 6-7.[1] Strom is similar to other specialized strike staffing agencies (and different from regular temp agencies) in terms of its client services, including its recruitment of only those workers who will do the work of crossing picket lines and its provision of worker transportation services across picket lines, both of which are essential to its business as a strike-staffing company. *Id.* at 3, 13-15.

Plaintiff submitted the Expert Report of Dr. Erin Hatton to provide the trier of fact with background and context on this specialized industry, and Strom now challenges the admissibility of this expert evidence. Dr. Hatton's testimony is relevant, reliable, and fits this case, and it will aid the jury. Strom has provided no basis to exclude it.

Dr. Hatton is a professor, trained sociologist and an expert in the field of work and labor, specifically in the use of temporary labor. She is an author of three peer-reviewed books, and numerous articles on the subjects of work and temporary labor. Dr. Hatton is regularly interviewed by journalists from a wide area of media outlets—including *NPR*, *Business Insider*, *C-Span*, *Reuters*, *The Guardian*, *Bloomberg News*, *Fortune*, and *The Washington Post*—about various workplace issues, including gig work, unions, temporary work, job quality, and other labor and

---

[1] Dr. Hatton's Expert Report was submitted to this Court in connection with Plaintiff's Motion for Class Certification ("Certification Mot.") as Exhibit 10, at ECF No. 69-11. For ease of references, Plaintiff's exhibits associated with his Motion for Class Certification and this Opposition are all filed with concurrent numbering, and can be easily identified at the Omnibus Index of Evidence, filed contemporaneously with this brief and with Plaintiff's Reply in Support of Class Certification. In addition, all terms utilized in the Certification Motion are used herein. Courtesy copies of these documents will also be provided to Chambers.

labor market issues. Dr. Hatton teaches graduate and undergraduate level courses on her areas of expertise, including classes on Qualitative Data Analysis; Writing for Publication; and Qualitative Research Methods.

Dr. Hatton has also published one of the few peer-reviewed research articles on the field of strike-staffing, *Temporary Weapons: Employers' Use of Temps against Organized Labor*, 67(1) CORNELL I.L.R. 86 (2014) ("*Temporary Weapons*"), Exhibit 84. This article was selected for publication in the prestigious CORNELL UNIVERSITY INDUSTRIAL AND LABOR RELATIONS ("ILR") REVIEW – a highly selective journal that accepts only 10 percent of all papers submitted. *See* Ex. 89 [ILR REVIEW Letter] (January 6, 2022 letter from the Editors of the ILR REVIEW, describing the journal's rigorous review process). *Temporary Weapons* was published in the same year that Strom was retained to provide its services for ATI during the lockout that is the subject of this litigation.

Plaintiff cited to Dr. Hatton's *Temporary Weapons* article in support of his claims in his Complaint. *See* ECF No. 4 at ¶¶ 8-10. Earlier in this litigation, and in the prior case that was appealed to the Third Circuit, Strom asked this Court to strike reference to Dr. Hatton's article, arguing that the information was "immaterial, impertinent and scandalous" under Rule 12(f). Dkt. No. 10; *see also* Civil Action No. 2:17-cv-00911 at ECF No. 16. The Court declined Strom's invitation to do so. *See Smith v. Strom Eng'g Corp.*, 2019 WL 12363207, at *5-6 (W.D. Pa. Nov. 14, 2019) (ECF No. 19) ("*Smith II*").

Now that class certification discovery has concluded, Plaintiff is prepared to substantiate the allegations in his Complaint relating to the nature of Strom's business and the work it hires the RWs to perform, in part, through the expert testimony of Dr. Hatton. Dr. Hatton's Expert Report is based on her extensive prior, peer-reviewed research, using the qualitative research methods in

which she was trained, and in which she now instructs others. In preparing her report, she considered a significant body of published works and primary source material, in addition to all of the depositions, deposition exhibits, declarations, and other business documents produced in this litigation. The Expert Report is both relevant and reliable. Moreover, Dr. Hatton's Expert Report will be helpful to a trier of fact to understand the background and context of the industry from a source of evidence besides Strom's self-interested witnesses or the *ipse dixit* of its lawyers.

Strom again tries to prevent this evidence from entering the case, this time by abusing the gatekeeping function of Rule 702 through an improper and baseless *Daubert* challenge. But Rule 702 has a "liberal policy of admissibility," *Pineda v. Ford Motor Co*., 520 F.3d 237, 243 (3d Cir. 2008), and "the rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702, Advisory Comm. Notes (2000).[2] Courts routinely permit experts on an industry to explain to the jury the intricacies, regulations, and/or customs of a specialized industry and to apply their industry knowledge to the facts of the case, just as Dr. Hatton does here. *See infra* n.28 and text.

Strom's motion can best be described as grasping at straws. Strom's attorneys thumb their noses at academic research by characterizing Dr. Hatton's peer-reviewed books and articles as "random gathering and review of some NLRB decisions and newspapers articles addressing labor disputes." Motion to Strike at 14. Ignoring and mischaracterizing Dr. Hatton's testimony to the contrary, Strom boldly asserts that Dr. Hatton's research utilizes "non-existent methodology." *Id.* at 17. Strom did not engage a rebuttal expert, and does not present any cogent attack on the methods Dr. Hatton utilized. Rather Strom asks the Court to accept the "unreliability" of Dr. Hatton's

---

[2] Judge Goldberg in the Eastern District of Pennsylvania recently rejected a *Daubert* challenge and remonstrated the parties about a similar abuse of this process in an antitrust case. *See In re Suboxone Antitrust Litig*., No. 13-MD-2445, 2021 WL 662292 (E.D. Pa. Feb. 19, 2021) ("I respectfully suggest that counsel should more carefully consider the difference between pressing a true *Daubert* challenge and alternative forms of advocacy used to contest an expert opinion through either a traditional trial objection, a counter expert's opinion, or cross-examination.").

testimony based on its hired lawyers' say so. The Court should reject this invitation. Strom's attack on well-established qualitative research methods is, at most, fodder for cross-examination, and provides no basis for exclusion.

To be clear, Dr. Hatton's testimony is in no way "an effort to bridge evidentiary gaps that [Plaintiff] could not fill during discovery." Mot. at 1. Indeed, as set forth in Plaintiff's Motion for Class Certification, and contemporaneously filed Reply Brief, the two employment agreements that RWs were required to sign as a term and condition of their employment specifically detail the duties of RWs in the course of their travels, and this "smoking gun" evidence is common to all RWs. *See* Certification Mot. at 2; *see also* Ex. 1 [Project Assignment Agreement] & Ex. 2 [Picket Line Agreement]. But Strom seems intent on obfuscating the nature of these documents, and continues to argue that strike-staffing is no different than traditional labor staffing, and that travel to and from and across the picket lines is no different than an ordinary commute.[3] Dr. Hatton's testimony will be of material assistance to the trier of fact on this issue, which will be central to the case. Strom's latest attempt to prevent the trier of fact from hearing about the nature of its work and the work of RWs should be rejected.

---

[3] Dr. Hatton uses her professional background and expertise to explain why Strom's defense lacks merit: Ex. 83 [Hatton Dep.] at 131:24-132:20 ("I do believe it's different. So I would say that for most people's jobs, regular jobs, the commute to work isn't really a part of their jobs. It's not something – and it's not a part – you know, let's say you work at a hospital and the hospital is in the business of providing healthcare to the community. Your particular commute to that job is not a part of that hospital's services to the community. But for strike replacement workers, getting to and from the work across picket lines is actually a really central component of the services that strike staffing agencies provide to its companies."). *See generally* Ex. 10 [Expert Report] (explaining basis for her opinion).  Notably, notwithstanding Strom's arguments to the Court on this issue, in private correspondence, Strom's President, Jim Corrigan appears to readily agree with Dr. Hatton: "Unlike anything even mildly resembling traditional staffing, things in labor disruption staffing move at 20 times the speed of everyone else's fastest mode. … Specifically to ATI, we were harassed by the union—the USW – far more than ever in our history… We had incidents of extreme violence, one of which nearly killed 9 people. … I even purchased a fleet of buses in order to maintain better safety in crossing picket lines." Ex. 58 [Strom-Smith_0009497].

## II.     RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

### A.     Strom Unsuccessfully Tried to Strike Material of the Same Nature It Now Seeks To Exclude

This matter was originally filed in this Court on July 10, 2017. *Smith v. Allegheny Tech., Inc.*, No. 2:17-cv-0911-MRH-RCM, ECF 1 (W.D. Pa.). The original Complaint, including its subsequent amendments, plausibly alleges that Strom failed to pay its RWs for all time worked-namely time spent traveling to and crossing the picket lines during the 2015-2016 lockout at ATI, in violation of the PMWA. *Id. See also* ECF No. 1, 4; *see Smith v. Allegheny Techs., Inc*., 754 Fed. Appx. 136 (3d Cir. 2018) ("*Smith* I"); *Smith II*, 2019 WL 12363207 (adopted as opinion of the district court, at ECF No. 26) ("[U]pon reviewing the well-pleaded allegations in the Amended Complaint, they plausibly establish that commuting and crossing the picket lines was part of the temporary workers' duties.").

The Complaint includes allegations describing the nature of Strom's business in strike staffing. *See* ECF No. 4 at ¶¶ 7-18. Several of the allegations cited to Dr. Hatton's 2014 peer-reviewed article, *Temporary Weapons. Id.* at ¶¶ 8-10. During motion to dismiss briefing, Strom asked the Court to strike these and related allegations as "immaterial, impertinent and scandalous" under Rule 12(f). ECF No. 10; Civil Action No. 2:17-cv-00911 at ECF No. 16. Specific to the allegations regarding Dr. Hatton's article, Strom argued: "[i]f there is information, such as newspaper articles, law review journals, craigslist ads, and even the union's website – in other words evidentiary material – that Plaintiff wishes to confirm or use as evidence in this lawsuit, the proper method to do so is through discovery."[4] ECF No. 10 at 22; *see also id.* at 23 ("This pleading

---

[4] Plaintiff has done just that. In addition to Dr. Hatton's expert report, Plaintiff produced relevant newspaper articles, job advertisements, and information from the USW website.

tactic, if permitted, would improperly 'shift the factual emphasis' from the discovery stage to the pleading stage …"); *see also* No. 2:17-cv-00911, ECF No. 16 at 9-11 (same).

This Court denied Strom's motion to strike these allegations. ECF No. 63. As Plaintiff successfully argued at the pleading stage:

> these allegations are relevant to pleading how and why the work that Plaintiff and class members performed in traveling to and crossing picket lines is compensable. It is the very nature of Strom's business that defines the essence of the work that Plaintiff performed, and the basis for the compensation that Plaintiff seeks under Pennsylvania state law. Plaintiff and the RW's efforts in traveling to and crossing the picket line were integral features of the job itself, and were expected duties of the work they performed for Strom's benefit. The[se allegations] provide the context for explaining how and why the nature of the work that Plaintiff and RWs performed is fundamentally different than a typical home to work commute by an employee, and is therefore compensable.

ECF 15 at 15; *see Smith II*, 2019 WL 12363207, at *6 ("[h]ere, while the Amended Complaint may contain factual details beyond those necessary to meet the pleading standards of Fed. R. Civ. P. 8(a), the Court cannot conclude at this stage of the proceedings that the allegations are so unrelated to plaintiff's claims as to be unworthy of consideration.").

The case proceeded to discovery, and the parties have engaged in significant discovery relating to class certification, including eight fact witness depositions of Strom's management; a corporate representative deposition of Strom; Plaintiff Smith's deposition; the exchange of extensive written and document discovery; and third-party subpoenas and depositions. As set forth in Plaintiff's Motion for Class Certification, the record evidence strongly supports the allegations in the Complaint, including that the class should certified for trial.

On June 16, 2021, Plaintiff disclosed Dr. Erin Hatton as a witness, prepared to provide expert testimony in this matter. On September 9, 2021, Dr. Hatton produced her expert report. *See* Ex. 10 [Expert Report]. Strom did not designate an expert for rebuttal or other purposes and did not submit an expert report on or before October 12, 2021. *See* ECF No. 63 (setting deadlines for

Defendant's expert designation). On October 8, 2021, Strom served a subpoena for deposition and

documents on Dr. Hatton. On October 22, 2021, Dr. Hatton was deposed by Strom.

  **B.**  **Dr. Hatton's Qualifications**

  Dr. Hatton is an expert in the field of work and labor. Ex. 83 [Hatton Dep.] at 14:12-18;

*see also* Ex. 10 [Expert Report] at Appendix A (Curriculum Vitae). Dr. Hatton is an associate

professor of sociology at the State University of New York at Buffalo. *See* Ex. 10 [Expert Report]

at Section I; Appendix A. She is a research professor, and her primary area of specialization—in

both research and teaching—is work and workers, especially vulnerable workers, though her

research also extends into the fields of social inequality, labor, law, and social policy.[5] *Id.*

  Dr. Hatton has published three books and numerous articles on work and workers. *Id; see*

*also* Appendix A.[6] A significant portion of Dr. Hatton's research has focused on the temporary

help industry, and relatedly, the strike staffing industry. Ex. 83 [Hatton Dep.] at 14:25-15:10; 89:8-

90:1. Dr. Hatton's first book, THE TEMP ECONOMY: FROM KELLY GIRLS TO PERMATEMPS IN

POSTWAR AMERICA (Temple University Press, 2011), analyzes the temporary help industry and

the rise of the new economy. Ex. 10 [Expert Report] at Section I. THE TEMP ECONOMY won an

Honorable Mention for the Distinguished Scholarly Monograph Award from the American

Sociological Association's Labor & Labor Movements Section. *Id.* Dr. Hatton researched the strike

staffing industry and the use of replacement work in labor disputes and then published her findings

---

[5] The University at Buffalo holds Dr. Hatton out as a Faculty Expert on the topics of "[l]abor movements, gig economy, job security, coerced labor, pay for college athletes, minimum wage, workfare." *See http://www.buffalo.edu/news/experts/erin-hatton-faculty-expert-labor-gig-economy.html* (last visited Jan. 4, 2022).

[6] Her recent book, COERCED: WORK UNDER THREAT OF PUNISHMENT (University of California Press, 2020), analyzes incarcerated, workfare, college athlete, and graduate student workers. *See* Ex. 10 [Expert Report] at Section I. Dr. Hatton is an also editor of the recent book LABOR AND PUNISHMENT: WORK IN AND OUT OF PRISON (University of California Press, 2021). *Id.* This interdisciplinary volume examines the multiple and multi-directional intersections between the carceral state and labor and employment in the United States today. *Id.*

in her 2014 article in the ILR REVIEW titled "*Temporary Weapons: Employers' Use of Temps against Organized Labor.*" *Id.* Dr. Hatton also examined this topic in THE TEMP ECONOMY. *Id.*

Dr. Hatton is regularly interviewed by journalists from a wide area of media outlets—including *NPR*, *Business Insider*, *C-Span*, *Reuters*, *The Guardian*, *Bloomberg News*, *Fortune*, and *The Washington Post*—about various workplace issues, including gig work, unions, temporary work, job quality, and other labor and labor market issues. *Id.*

Dr. Hatton has taught numerous graduate and undergraduate courses at the University at Buffalo, on whose faculty she has served for more than 13 years. *Id.* These courses include Survey of Sociology; Work, Employment & Society; Wealth and Poverty; Qualitative Data Analysis; Sociology of Work; Gender and Work; Sociology of Poverty; Writing for Publication; and Qualitative Research Methods. *Id.*

Dr. Hatton holds a Ph.D. and Master's degree in sociology from the University of Wisconsin-Madison. *Id.* During her eight-year course of study, Dr. Hatton was trained on research methods, as well as substantive literature around various topics, often around the issues of work and economy and labor. Ex. 83 [Hatton Dep.] at 101:13-103:17. Since 2016, Dr. Hatton has served as Co-Editor of the Organizations & Work Section of the peer-reviewed journal SOCIOLOGY COMPASS. *See* Ex. 10 [Expert Report] at Section I. Since 2019, she has served as the Section Editor for the Organizations, Occupations and Work Section of WORK IN PROGRESS, a public sociology blog for the American Sociological Association. *Id.*

## C.     Dr. Hatton's Expert Report

Dr. Hatton was retained to provide an expert opinion in this matter. Given Dr. Hatton's knowledge of and research into the strike staffing industry, her assignment was as follows:

1.    to explain the history, background, and purpose of the industry and to provide an overview of role of temporary strike staffing agencies and how they interact

with companies during labor disputes between management and union workforces;

2. to explain, based on her research and industry knowledge, the reasons why companies use specialized strike staffing agencies during labor disputes, as well as identify the differences between strike staffing temporary agencies and nonspecialized temporary staffing agencies.

3. to explain, based on her research and industry knowledge, how crossing picket lines by replacement workers supplied by strike staffing agencies affects labor disputes and negotiations between the company and union;

4. to review relevant documents and materials and evaluate whether Strom Engineering Corporation's engagement with ATI during the lockout, as well as the work performed by Plaintiff and other replacement workers, was consistent with her research and knowledge regarding similar workers and businesses in the industry.

*See* Ex. 10 [Expert Report] at Section II. In drafting her report, Dr. Hatton considered a number of published materials, prior research, as well as all of the depositions and deposition exhibits, declarations and a substantial number of documents produced in the case. A list of documents that Dr. Hatton considered is included in endnotes 1-101 and in Appendix B, at 1-1264.

Dr. Hatton's primary findings in this matter are as follows:

- Strom Engineering is similar to other specialized strike staffing agencies (and different from regular temp agencies) in terms of its client services, including its recruitment of *only* workers who will do the work of crossing picket lines and its provision of worker transportation services across picket lines. Both of these services are essential to its business as a strike-staffing company.

- Crossing picket lines is an essential component of replacement workers' jobs.

- For replacement workers generally and in this case specifically, successfully crossing picket lines is equally as important as other aspects of replacement workers' jobs.

- Crossing picket lines is difficult and sometimes dangerous work. Strike-staffing agencies (and the companies that hire them) require replacement workers to perform this difficult/dangerous labor because it is essential to their goal of undermining union power.

- Because crossing picket lines is an essential component of replacement workers' jobs and because this work is difficult/dangerous, employers, such as

9

Strom, regulate and control replacement workers' process of traveling to and crossing the picket line.

Hatton Report Section III.[7] Dr. Hatton does not purport to render an opinion on the ultimate issue in the case, *i.e.* whether traveling to and crossing the picket line a compensable activity under the PMWA. Ex. 83 [Hatton Dep.] at 99:5-17; 101:5-12; 199:22-200:23 ("I was asked to provide what I know about this industry as—given my knowledge, given my research. And I can't extend beyond them, and as an ethical scholar I don't extend beyond what I know.").

### D.     Dr. Hatton's Prior Relevant Research

Dr. Hatton's report was informed by prior publications of her work, including *Temporary Weapons* and THE TEMP ECONOMY. Ex. 83 [Hatton Dep.] at 27:7-19. Strom's attack focuses not on any specific conclusions in Dr. Hatton's report, but instead attacks the methodology behind her research underlying her *Temporary Weapons* article. *See* Mot. to Strike at 6, 9, 10, 14.

The research that Strom disparages as a "random gathering and review of some NLRB decisions and newspapers articles addressing labor disputes," Mot. to Strike at 14, was deemed fit for publication in the CORNELL UNIVERSITY ILR REVIEW, one of the most prestigious journals focused on the workplace in the world.[8] Any article accepted for publication by the ILR REVIEW has to meet the highest of academic standards for rigorous methodology – ultimately only 10 percent of all papers submitted to the journal are accepted.[9] Dr. Hatton's article, as with all articles

---

[7] Just as in its prior Motion to Strike briefing at the pleading stage, Strom's Motion to Strike Dr. Hatton's testimony is vague in its scope. Strom does not distinguish between various aspects of Dr. Hatton's Expert Report or challenge any specific conclusion reached.

[8] *See* Ex. 89 [January 6, 2022 Letter from the Editors of the CORNELL UNIVERSITY INDUSTRIAL AND LABOR RELATIONS ("ILR") REVIEW] ("Our journal is an interdisciplinary journal primarily based in economics and institutional economics and sociology. We are the oldest (75th anniversary this year) journal in our field, and are considered to be the top journal in a field of 20, according to a 2019 international survey of 53 academic experts, conducted by University Council of Industrial Relations and Human Resource Programs (UCIRHRP) and the Labor and Employment Relations Association (LERA). In a review of 30 journals in a broader definition of our field, published in the 2021 Journal Citation Report (JCR, based on 'Web of Science' data), the ILR Review ranks 5th.").

[9] The Editors of the ILR Review have described their rigorous review process in detail in a letter attached as Exhibit 89 ("Our review procedures follow the most rigorous scientific review standards. … Our papers include quantitative,

selected for publication by the ILR REVIEW, underwent a rigorous peer review process. *See* Ex. 83 [Hatton Dep.] at 102:23-103:6; 104:6-106:4. Articles published in the ILR REVIEW are routinely cited as authoritative by governmental agencies.[10]

Contrary to Strom's unsupported assertions, Dr. Hatton's work is firmly grounded in well-established research methodology, standard in her field. Dr. Hatton has received extensive training in research methods, and teaches graduate and undergraduate level classes on research methods. Ex. 83 [Hatton Dep.] at 103:18-104:5; Ex. 10 [Expert Report] at Appendix A. The type of analysis she deploys in her research and in which she would consider herself an expert is known as qualitative analysis.[11] Ex. 83 [Hatton Dep.] at 104:2-5.

Dr. Hatton's methodology in *Temporary Weapons* is best described as content analysis – analyzing the contents of the primary source material she relied on to identify patterns, which are presented as a typology.[12] The article itself contains an extensive description of the data and methodology utilized in a Section titled: "Data and Method." *Compare* Ex. 84, *Temporary*

---

qualitative, and mixed methods research methodologies, and our reviewers are chosen based on their expertise in these methods. … Reviewers are instructed to evaluate the quality of the research (theory development, methodological rigor, data quality, etc.), the importance of the contribution to the field (advancing theory, providing novel empirical findings), and the overall quality of the presentation (logic, organization, writing). We particularly emphasize empirical rigor - meaning that the data are objective, appropriate to answer the question at hand, and that the author uses appropriate data analytic techniques.").

[10] *See, e.g.,* US Dept. of Labor, Wage and Hour Division, "Rescission of Joint Employer Status under the Fair Labor Standards Act Rule," 86 FR 14038-01, 2021 WL 929347(F.R.) at *14047 n. 153 (citing ILR REVIEW article); U.S. Securities and Exchange Commission, "Temporary Rules to Include Certain "Platform Workers" in Compensatory Offerings Under Rule 701 and Form S-8", 85 FR 79936-01, 2020 WL 7263064(F.R.) (Dec. 11, 2020), at *79950 n.116 (same).

[11] *See, e.g,* Ex. 85 [HOWARD LUNE AND BRUCE L. BERG, QUALITATIVE RESEARCH METHODS FOR THE SOCIAL SCIENCES (9th Ed. 2017) ("Lune & Berg")]  at 1.3: Qualitative Strategies: Defining an Orientation ("Qualitative procedures seek patterns among cases, but do not reduce these cases to their averages. They provide a means of accessing unquantifiable knowledge …").

[12] *See, e.g,* Ex. 85 [Lune & Berg] at 11.1: What is Content Analysis? ("Content analysis is a careful, detailed, systematic examination and interpretation of a particular body of material in an effort to identify patters, themes, assumptions and meanings.").

*Weapons* at 91-94 (describing data relied upon and methodology utilized) *with* Mot. to Strike at 17 ("nothing but inferences she has made using a non-existent methodology.").

Dr. Hatton described the methodology of her 2014 ILR REVIEW article as follows: "In this article I'm really creating a typology of how employers are using temps and temp agencies and strike staffing agencies and strike or replacement workers in the context of -- with unions and labor disputes." Ex. 83 [Hatton Dep.] at 69:14-18.  When asked to define a typology, Dr. Hatton explained:

> A typology is -- it is – you know, instead of suggesting prevalence, right, this is not a survey of all labor disputes in which I can say in 86 percent of them X happened. We don't have those data. And so in order to understand this industry, which is not readily documented in any existing dataset, I created my own dataset in order to, at the very least, get an understanding of how something is happening. In this case how employers are using temp- temp agencies and strike staffing agencies and strike or replacement workers in – as a point of leverage over unions.

*Id.* at 69:19-70:8. The use of typologies is a longstanding research method recognized in the field of sociology, and is a way of synthesizing a great deal of complex information and presenting it in a relatively straightforward fashion.[13]

Strom's focus on the number of NLRB cases Dr. Hatton reviewed fundamentally misunderstands the nature of her research and methodology, appearing to confuse qualitative research methods with quantitative methods. *See generally* Ex. 83 [Hatton Dep.] at 26:22-83:24; *see id.* at 110:1-16 ("I should note here that my analysis of this industry is not about kind of bean counting. Because it's actually quite- that wouldn't reveal a lot about what's happening. I'm trying on- with my analyses that we're talking about here I'm describing how this industry works,

---

[13] *See, e.g,* Ex. 85 [Lune & Berg] at 6.5.1: Typologies ("A typology is a systematic method for classifying similar events, actions, objects, people, or places, into discrete groupings"); Ex. 87 [David Collier, Jody LaPorte, and Jason Seawright, *Putting Typologies to Work: Concept Formation, Measurement, and Analytic Rigor*, POLITICAL RESEARCH QUARTERLY (2012)] ("Typologies are well-established analytic tools in the social sciences"); Ex. 86, [Howard Becker, *Constructive Typology in the Social Sciences*, 5 AMERICAN SOCIOLOGICAL REVIEW 1 (1940)] (demonstrating the longstanding utility and practice of typologies as a recognized sociological tool).

including the services it provides the companies."). Whereas quantitative research might identify how often something occurs, qualitative research can identify how something happens.[14] Dr. Hatton's research on the strike staffing industry identifies how companies use replacement workers in the context of labor disputes.

Although Strom characterizes her research as "old," *see* Mot. to Strike at 9, Dr. Hatton's *Temporary Weapons* article was published in 2014, the same year in which ATI retained Strom to provide strike staffing services in anticipation of the lockout. *See* Ex. 5 [30(b)(6) Dep.] at 109:8-110:7 (Strom engaged by ATI in September 2014). It is thus strikingly timely. In addition, Dr. Hatton's Expert Report incorporates not just Dr. Hatton's prior research, but also additional, independent research she performed in connection with this case, and an application of her expertise to the evidence in this case.

## III.   LEGAL STANDARD

Rule 702 places district courts in the role of "gatekeeper," requiring courts to "'ensure that any and all [expert] testimony...is not only relevant, but reliable.'" *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999) (quoting *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 589 (1993)). The party offering an expert must demonstrate, by a preponderance of the evidence, that the expert's qualifications and opinions comply with Federal Rule of Evidence 702. *Daubert*, 509 U.S. at 592-93). Rule 702 has "a liberal policy of admissibility," *Pineda*, 520 F.3d at 243 (3d Cir. 2008), and "the rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702, Advisory Comm Notes (2000).

---

[14] *See, e.g,* Ex. 85 [Lune & Berg] at 1.1: Qualitative Methods, Qualitative Data ("Qualitative and quantitative methods give us different, complementary pictures of the things we observe. Unfortunately, because qualitative research tends to assess the quality of things using words, images, and descriptions and most of the quantitative research relies chiefly on computers, many people erroneously regard quantitative strategies as more scientific than those employed in qualitative research. The error of thinking underlying this particular critique is that of confusing the study of imprecise subject matter with the imprecise study of subjects.").

The *Daubert* inquiry "embodies a trilogy of restrictions on expert testimony: qualification, reliability, and fit." *Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003). As the Court in *Daubert* stated: "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." 509 U.S. at 595.

To qualify as an expert, "Rule 702 requires the witness to have 'specialized knowledge' regarding the area of testimony." *Betterbox Commc'ns Ltd. v. BB Techs., Inc.,* 300 F.3d 325, 335 (3d Cir. 2002) (quoting *Waldorf v. Shuta,* 142 F.3d 601, 625 (3d Cir. 1998)). "'The basis of this specialized knowledge can be practical experience as well as academic training and credentials.'" *Elcock v. Kmart Corp.,* 233 F.3d 734, 741 (3d Cir. 2000) (quoting *Waldorf,* 142 F.3d at 625). The Third Circuit has "'interpreted the specialized knowledge requirement liberally, and ha[s] stated that this policy of liberal admissibility of expert testimony extends to the substantive as well as the formal qualification of experts.'" *Id*. "The language of Rule 702 and the accompanying advisory committee notes make clear that various kinds of 'knowledge, skill, experience, training, or education,' qualify an expert as such." *In re Paoli R.R. Yard PCB Litig.,* 916 F.2d 829, 855 (3d Cir.1990) (quoting Fed. R. Evid. 702). "'[A]t a minimum, a proffered expert witness ... must possess skill or knowledge greater than the average layman.'" *Elcock*, 233 F.3d at 741 (quoting *Waldorf,* 142 F.3d at 625). And "it is an abuse of discretion to exclude testimony simply because the trial court does not deem the proposed expert to be the best qualified or because the proposed expert does not have the specialization that the court considers most appropriate." *Pineda,* 520 F.3d at 244 (quoting *Holbrook v. Lykes Bros. S.S. Co.,* 80 F.3d 777, 782 (3d Cir. 1996)).

As to reliability of an expert's opinion, the Third Circuit has interpreted reliability "to mean

that an expert's testimony is admissible so long as the process or technique the expert used in formulating the opinion is reliable." *Id.* (internal quotations omitted) (quoting *Paoli*, 35 F.3d at 742). Notably, "[t]he evidentiary requirement of reliability is lower than the merits standard of correctness." *Id.* at 744. In assessing reliability, both the Supreme Court and the Third Circuit have emphasized that no single factor is determinative.[15] A Court thus should consider the nonexclusive list of factors set out by the Supreme Court in *Daubert*, other factors enunciated in the Third Circuit's jurisprudence, as well as any other factors that would aid in this consideration.

Importantly, Rule 702 does not require the party proffering the expert to demonstrate the "correctness" of the expert's opinion. *Paoli*, 35 F.3d at 744 (concluding that the "evidentiary requirement of reliability" amounts to a lower burden "than the merits standard of correctness"). Rather, the party need only demonstrate "by a preponderance of the evidence" that the expert's opinion bears adequate indicia of reliability. *Id*. Indeed, "[a] judge will often think that an expert has good grounds to hold the opinion...even though the judge thinks the opinion otherwise incorrect." *Id*. Therefore, "[t]he focus ... must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595. "When the methodology is sound, and the evidence relied upon sufficiently related to the case at hand, disputes about the degree of

---

[15] While the Supreme Court articulated a number of factors in its seminal opinion in *Daubert*, it has explained that the *Daubert* factors are "meant to be helpful, not definitive." *Kumho Tire*, 526 U.S. at 151. The Third Circuit similarly has instructed that "a district court should take into account all of the factors listed by either *Daubert* or [prior Third Circuit jurisprudence on the issue, specifically *United States v. Downing*, 753 F.2d 1224 (3d Cir. 1985),] as well as any others that are relevant." *Oddi v. Ford Motor Co.*, 234 F.3d 136, 145 (3d Cir. 2000). The Third Circuit has identified the following non-exhaustive factors to be taken into consideration when evaluating the reliability of a particular methodology: (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put. *Elcock v. Kmart Corp.*, 233 F.3d 734, 745–46 (3d Cir. 2000). The Third Circuit has recognized that while the general requirement of reliability set forth in *Daubert* applies to all expert testimony, the "list of specific factors would often be of little use in evaluating non-scientific expert testimony." *United States v. Davis*, 397 F.3d 173, 178 (3d Cir. 2005).

relevance or accuracy (above this minimum threshold) may go to the testimony's weight, but not its admissibility." *Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 852 (Fed. Cir. 2010), *aff'd*, 564 U.S. 91 (2011).

Finally, for expert testimony to be admitted it must "fit" the proceedings. This question "is one of relevance and expert evidence which does not relate to an issue in the case is not helpful." *In re TMI Litig.*, 193 F.3d 613, 670 (3d Cir. 1999). The standard for fitness is "not that high" but is "higher than bare relevance." *Paoli*, 35 F.3d at 745. "To determine whether an expert's testimony "fits" the proceedings, this Court asks whether it 'will help the trier of fact to understand the evidence or to determine a fact in issue.'" *UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*, 949 F.3d 825, 835 (3d Cir. 2020) (quoting Fed. R. Evid. 702(a)).

## IV.   ARGUMENT

### A.   Dr. Hatton Is Qualified to Offer Expert Testimony

Strom first argues that Dr. Hatton is not qualified to provide expert testimony on the nature of strike staffing agencies. But in doing so, Strom does not in any way meaningfully engage with Dr. Hatton's academic credentials.[16] Nor does Strom present any substantive evidence to support its spurious attacks on Dr. Hatton's expertise and reputation. Strom merely repeats over and over again that Dr. Hatton is unqualified, in hopes that the Court will agree based on its say so. Specifically, Strom argues that her expertise is only "relatively deep," is from 10 years ago, and has no grounding in personal experience of working for a strike staffing agency or experiencing a lockout. Mot. to Strike at 4-6. These arguments are irrelevant or inaccurate, and should be rejected.

As set forth above, Dr. Hatton is a renowned scholar on the in the field of work and labor,

---

[16] Formal training shows that a proposed expert adheres to the intellectual rigor that characterizes the field, while peer-reviewed publications demonstrate an acceptance by the field that the work of the proposed expert displays "at least the minimal criteria" of intellectual rigor required in that field. *Daubert v Merrell Dow Pharm*, 43 F3d 1311, 1318 (9th Cir 1995) (on remand) ("*Daubert* II").

with a special focus on temporary workers. *See supra* Section II(B).  Her prior research on the strike staffing industry was published in a preeminent labor journal, and her published works are peer-reviewed. Her qualifications, as described above, more than readily satisfy the Third Circuit's standard of having more knowledge than "the average layman." *Elcock*, 233 F.3d at 741. Moreover, her article on the strike-staffing industry was published in the same year as Strom's engagement with ATI; Strom's curious argument about her research being "outdated" appears to reflect only the vintage of this case based on its long procedural history. Strom does not suggest how Dr. Hatton's research may be outdated. In fact, Dr. Hatton's testimony expressly concerns the history of the strike staffing industry and applying this background to the facts of this case. This relevant background information cannot be said to have changed over the course of 10 years.[17] Importantly, Dr. Hatton's expertise did not end after her publication of *Temporary Weapons*. She has continued her work and research, as indicated in her publications, *supra*, and her Expert Report reflects her current expertise in this relevant field.

Strom's argument that Dr. Hatton's experience is academic as opposed to firsthand similarly misunderstands the qualification requirements set out by the Third Circuit, which has expressly noted that the basis of the "specialized knowledge" required by Rule 702 "can be practical experience ***as well as academic training and credentials***." *Elcock*, 233 F.3d at 734 (internal quotations omitted) (emphasis added); *see also Wolfe v. Allstate Prop. & Cas. Ins. Co.*,

---

[17] While, in some instances, there might be a reason why research done 10 years ago is in fact outdated – for example, research on evolving science technologies – this is not true in this case, and Strom has made no such claim. The cases that Strom cites to support this in fact demonstrate how inapposite this argument is to Dr. Hatton's research and area of expertise. *See, e.g., Furlan v. Schindler Elevator Corp.*, 864 F. Supp. 2d 291, 298 (E.D. Pa. 2012), aff'd, 516 F. App'x 201 (3d Cir. 2013) (excluding expert testimony on elevator operations on reliability grounds, not qualifications, where the proposed expert's methodology failed to take into account knowledge about engineering and operation of a particular type of elevator in the thirty years since the expert had last performed maintenance work); *Curry v. Royal Oak Enterprises, LLC*, No. CIV.A. 11-5527, 2013 WL 3196390, at *4 (E.D. Pa. June 25, 2013) (expert who developed product labels for items other than those at issue with the case 25 years prior deemed unqualified to testify in an area expected to evolve -- warning labels concerning flammability and hazardous materials).

No. 4:10-CV-800, 2012 WL 12929813, at *4 (M.D. Pa. July 23, 2012) (finding "career academic" qualified and noting that "while practical experience can satisfy the specialized knowledge prong, so too can 'academic training and credentials.'").[18] Further, Dr. Hatton's testimony should be admitted even if the Court determines that Dr. Hatton has expertise as a sociologist of labor and not on strike staffing agencies in particular, as an expert need not specialize in the exact question at issue in order to be qualified to opine on it.[19] Dr. Hatton more than satisfies the qualifications necessary to provide expert testimony in this matter.

### B.     Dr. Hatton's Expert Testimony is Reliable

Strom's reliability challenge to Dr. Hatton's testimony centers entirely on its boldly unsupported assertion that, "she did not follow any clearly defined methodology in rendering her opinions." Mot. to Strike at 6-12. In layman's terms, this assertion is flat wrong. As described above, *supra*, Dr. Hatton's peer reviewed and published research follows longstanding and widely recognized research methodology utilized in her field. *See, supra,* Section II(D). Dr. Hatton

---

[18] *See also Waldorf*, 142 at 625); *Dominion Res. SVC, Inc. v. Alstom Power, Inc.*, No. 3:16-CV-544, 2018 WL 3752878, at *4 (D. Conn. Aug. 8, 2018) (dismissing a *Daubert* challenge on the basis that an expert's "expertise comes from 'having an academic knowledge about the history of the insurance industry and the evolution of standard insurance forms,' but . . . 'lacks any practical, handson experience,'" and finding that "'one may be an expert solely based on . . <u>one's formal education despite a lack of practice experience.</u>'") (emphasis in original) (collecting cases); *D.B. v. Orange Cty., Fla.*, No. 6:13-CV-434-ORL-31DA, 2014 WL 4655739, at *1-2 (M.D. Fla. Sept. 17, 2014) (rejecting argument that sociology professor who studied corrections policy was not qualified because the expert "has never worked in a prison" and noting that there was "no basis for this Court to conclude that actual employment in a prison is a prerequisite to obtaining expertise regarding prison conditions and policies").

[19] Specialization in the exact question at issue is not required. *See Kannankeril v Terminix Int'l*, 128 F.3d 802, 809 (3d Cir. 1997) ("it is an abuse of discretion to exclude testimony simply because the trial court does not deem the proposed expert to be the best qualified or because the proposed expert does not have the specialization that the court considers most appropriate."); *Dominion Res. SVC, Inc.*, 2018 WL 3752878, at *5 (expert testimony on the "history," "operation," and "custom and practice" of an industry was admissible and not too general as to assist the jury, despite the expert not having specialized experience or study on the "particular submarket" or "precise question" at issue, because "[a]n expert's training need not narrowly match the point of dispute in the case."); *Lion Oil Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, No. 1:13-CV-01071, 2015 WL 11112430, at *1–2 (W.D. Ark. Oct. 20, 2015) (admitting testimony from expert, with "broad background in insurance law, through his education, research, and teaching," and rejecting argument that the expert was "not qualified to offer the opinions because he has minimal experience with specific policy issues" presented in the case); *D.B.*, 2014 WL 4655739, at *1-2 (rejecting argument that expert evidence should be struck because the expert's "years of research and education are 'specific to California prisons'" and noting that there was "no basis for this Court to conclude . . . that California Jails are so different from Florida jails that expertise regarding the former is of no relevance regarding the latter.").

testified at length about her methodology during her deposition, where Strom's lawyers often appeared confused and not well versed in the subject matter of accepted sociological research methodology. *See, e.g.,* Ex. 83 [Hatton Dep.] at 26:22-83:24.[20]

Strom does not provide any meaningful critique of the qualitative research methods that the *ILR Review* Editorial Board found fit to publish in their journal. It does not present any expert or even cite to a single authoritative source critiquing the use of content analysis or typologies. Instead, Strom's lawyers (who appear from their law firm biographies to be themselves untrained in research methods) merely shout insults: *i.e.* "create-your-own-expert," "knee-jerk," "knowledge … all of which she has learned from the Internet," "nothing but inferences she has made using a non-existent methodology." Mot. to Strike at 12, 17. Strom has already been chastised once for such empty rhetoric by this Court,[21] and this hatchet job fares no better.

Strom argues that "Dr Hatton merely used her knowledge of the strike staffing industry generally . . . as well as her understanding of picket lines generally . . . to make specific conclusions about Strom's business, picket line activity on the ATI Project, and to ultimately conclude that crossing picket lines was an 'essential component' of replacement workers' jobs." Mot. to Strike at 10. But Courts routinely allow for precisely this kind of expert testimony, permitting experts to explain to the jury the intricacies, regulations, and/or customs of a specialized industry and to apply

---

[20] Strom tries to make much hay of Dr. Hatton's answers to various open ended, vague, and hypothetical questions posed by Strom's lawyers at page 11-12 of its Motion to Strike. As a fulsome review of the deposition transcript reveals, these citations uniformly mischaracterize Dr. Hatton's responses and take them out of context, but also, fail to take into account the lack of specificity with which Strom's lawyers often posed questions to Dr. Hatton during the deposition. *See, e.g.* Ex. 83 [Hatton Dep.] at 140:17-141:5 ("Dr. Hatton: I believe that's what you just said, right, that they're no longer providing replacement workers. Mr. Vaughn: Right. Dr. Hatton: So I think you answered your own question, as I understand it.").

[21] *See* ECF No. 26 ("[T]he Court would observe that much of the Defendant's briefing as to both the Motions before the Court, and as to the Objections, appears to be based in part on the principle that an argument shouted louder is more persuasive. In the Court's experience, so far, that has not been a winning approach, and it does not prevail here.").

their expert knowledge of that industry to the facts of the case. *See Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 217 (3d Cir. 2006) (holding that expert's testimony regarding "[t]he customs and business practices in the securities industry at the time the parties entered into the Agreement provides an important context which will aid the jury in determining whether [Plaintiff] had the requisite scienter at the time to evade the registration requirements").[22]

Moreover, courts admitting expert testimony concerning the operations of an industry do not demand that such experts put forth a "testable theory or methodology" to support this opinion, as their expertise in an industry is sufficient basis for their opinion.[23] Courts have found that application of traditional *Daubert* factors to expert findings concerning "customs and practices" in an industry is "both illogical and irrelevant," *Wolfe v. Allstate Prop. & Cas. Ins. Co.*, No. 4:10-CV-800, 2012 WL 12929813, at *5 (M.D. Pa. July 23, 2012), and "stricter than required." *Cantor v. Perelman*, No. 97-CV-586 KAJ, 2006 WL 3462596, at *8 (D. Del. Nov. 30, 2006).

Indeed, the Court in *Cantor* expressly distinguished the Third Circuit authority cited by Strom – *Oddi v. Ford Motor Co.*, 234 F.3d 136 (3d Cir. 2000) – explaining that the Third Circuit in that case found the expert's testimony unreliable because the expert in *Oddi* opined on "a

---

[22] *See also First Nat'l State Bank of N.J. v. Reliance Elec. Co.*, 668 F.2d 725, 731 (3d Cir. 1981) (expert properly permitted "to provide the jury with information on bank customs and to assist the trier of fact with bank and industry practices"); *Grill v. Aversa*, No. 1:12-CV-120, 2014 WL 4784150, at *3 (M.D. Pa. Sept. 22, 2014) (holding that experts' testimony may be admitted where the witnesses were to "testify, in general terms, based upon their experience regarding industry practices and customs" and would "then provide a factual, descriptive narrative of defendants' conduct in light of these customs and practices"); *Dominion Res. SVC, Inc.*, 2018 WL 3752878, at *5 (finding an expert's testimony admissible regarding "common industry understanding", where the expert's "experience covers 'the history, structure, application, and construction of the [industry],'" as well as the "operation" of the industry and "industry custom and practice.").

[23] *Davis*, 397 F.3d at 179 (holding that a police officer's opinion concerning the methods of operation of drug traffickers was sufficiently reliable based solely on his years of experience); *Christoforetti v. Bally's Park Place, Inc.*, No. 12-CV-4687, 2021 WL 3879074, at *6–7 (D.N.J. Aug. 31, 2021) (holding that "the fact that [an expert] does not use a testable theory or methodology subject to peer review does not render his testimony unreliable under Rule 702. To the contrary, his vast experience in the . . . industry and the publications he references supports the reliability of his opinion."); *Nationwide Life Ins. Co. v. Commonwealth Land Title Ins. Co.*, No. 05-CV-281, 2011 WL 204619, at *8 (E.D. Pa. Jan. 20, 2011) (holding that an expert was qualified to "testify as to the custom and trade usage of certain terms used within title insurance policies" based on his experience in and knowledge of the industry and that "[n]o further 'methodology' for his opinions is necessary").

testable hypothesis that can be demonstrated using an identifiable methodology" but did not perform these tests, whereas an industry expert who provides context on the specifics of the industry provides opinions "that are not subject to proof by a particular methodology." *Cantor*, 2006 WL 3462596, at *8. The *Oddi* Court itself recognized this distinction when it noted that "[a]lthough there may be some circumstances where one's training and experience will provide an adequate foundation to admit an opinion and furnish the necessary reliability to allow a jury to consider it, this is not such a case." *Oddi*, 234 F.3d at 158.

The Third Circuit's opinion in *Elcock*, which Strom discusses, is similarly inapposite. The Court in *Elcock* considered the testimony of a proffered expert on vocational rehabilitation and found that the "underlying hypotheses" of and "standards controlling" his assessment could and should be subject to confirmatory testing, but that the expert's description of his methodology evinced a subjective approach that was not reliable. *Elcock*, 233 F.3d at 747-48. Moreover, the Court considered existing, accepted standards of vocational rehabilitation, and found that the expert had neither followed these approaches nor demonstrated that the alternative method was used by others in the field. Id. at 748-49. Here, conversely, there is no suggestion that Dr. Hatton is performing an assessment that is subject to confirmatory testing, nor that there is an existing methodology in the field from which she has departed.[24]

Strom's complaint that Dr. Hatton's testimony is not reliable because she "conducted no tests, interviews, first-hand observations, or statistical analyses, and failed to apply any research

---

[24] Likewise the out of circuit opinion in *Obrycka v. City of Chicago* is not to the contrary, as there the expert explained that he had "developed a methodology for interviewing, observing [ ] police work and analyzing the dynamics of the police organization," which consisted of "gathering as much firsthand knowledge as possible, through field work, observation, interactions with and interviews of police officers" but acknowledged that he did not follow this methodology in formulating the expert opinion he offered in that case. 792 F. Supp. 2d 1013, 1020, 1024 (N.D. Ill. 2011). This stands in direct contrast to the many instances in which experts have been permitted to provide context on a specialized industry and apply their knowledge of the industry to the facts at issue in a case.

methods (let alone acceptable ones) to the specific facts of this case" (Mot. to Strike at 10-11) is similarly off base. Conducting independent research related to the case is not necessary.[25] Indeed, Courts have held that expert testimony is properly admitted where it presents past research performed by the expert and applies that past research to the facts of the case, precisely what Dr. Hatton does in the Expert Report.[26] Strom's reliability challenge must be rejected.

### C.    Dr. Hatton's Expert Testimony Is Helpful to the Jury

Finally, Strom asserts that Dr. Hatton's testimony is not helpful to the trier of fact. The standard for fit is "not that high" but is "higher than bare relevance." *Paoli*, 35 F.3d at 745. To determine whether an expert's testimony "fits" the proceedings, this Court asks whether it "will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a); *see also UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*, 949 F.3d 825, 835 (3d Cir. 2020). In denying Strom's motion to strike reference to Dr. Hatton's research in the pleadings, the Court already rendered a preliminary determination on this issue. *See Smith II*, 2019 WL 12363207, at *5-6. Now, with the benefit of the full record of evidence, as well as Dr. Hatton's detailed Expert Report, the Court should affirm its finding, as it is plain that this evidence easily

---

[25] *See, e.g., Gerald v. R.J. Reynolds Tobacco Co.*, No. ST-10-CV-631, 2018 WL 4062154, at *10 (V.I. Super. Ct. June 12, 2018) (rejecting defendants' argument that an expert's testimony was "not the product of a reliable methodology . . . [because the expert] ha[d]n't conducted independent scientific studies or experiments and ha[d] considered only a small fraction of the universe of information available to him in reaching his conclusions," and holding that "[t]he examination of historical industry documents by an eminently qualified historian is similarly an acceptable and reliable methodology for use in establishing [ facts about the industry]").

[26] *See, e.g., In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, No. 13-MD-2445, 2020 WL 6887885, at *13-16 (E.D. Pa. Nov. 24, 2020) (approving expert report that offered opinions based on marketing studies that were performed 7-16 years previously); *D.B.*, 2014 WL 4655739, at *1-2 (professor of sociology who submitted an expert report that described "three major research projects related to corrections policy with which she was involved" was qualified to "opine on the policies and procedures utilized" in correctional facilities at issue in the case); *Perry v. Schwarzenegger*, 704 F. Supp. 2d 921, 940 (N.D. Cal. 2010) (expert "professor of history and American studies" was qualified and offered credible opinion testimony "on social history," specifically about "the widespread private and public discrimination faced by gays and lesbians . . . and the ways in which the Proposition 8 campaign echoes that discrimination," noting that the expert had "authored or edited books on the subject of gay and lesbian history").

surpasses the "higher than bare relevance" standard for admissibility under *Daubert's* gatekeeping function. *See Paoli*, 35 F.3d at 745.

Specifically, Strom argues that Dr. Hatton's testimony should be excluded because it is within the common knowledge of jurors. Strom contends that her "analysis involved nothing more than reviewing . . . the same evidence the factfinder will be asked to consider" and offering her "personal opinions" as to whether "crossing picket lines was an 'essential' aspect of replacement workers' jobs." Mot. to Strike at 14. Strom asserts that jurors will be asked to perform the same assessment and that "[t]hese matters certainly do not require any special expertise." [27] *Id.* at 14-15.

This argument stubbornly mischaracterizes the expert testimony offered by Dr. Hatton, who provides extensive background and history on the strike staffing industry, and applies her research to the facts of this case. Courts routinely permit this kind of expert testimony, recognizing that testimony concerning the "customs and business practices" in a specialized industry "provides an important context which will aid the jury" in considering the specific facts at issue in a given case. *Berckeley Inv. Grp., Ltd.*, 455 F.3d at 217. For example, courts have found that an expert was properly permitted "to provide the jury with information on bank customs and to assist the trier of fact with bank and industry practices" where the documents at issue were ambiguous and there were conflicting theories submitted by the parties. *First Nat'l State Bank of N.J.*, 668 F.2d at 731.[28]

The historical context that Professor Hatton provides is not within the common knowledge of jurors and, unlike the testimony discussed in the one case Strom cites to support this argument,

---

[27] Notably, this argument is logically incompatible with Strom's argument that Plaintiff seeks to use Dr. Hatton's testimony to fill gaps in the record because evidence is lacking.

[28] *See also In re: Tylenol (Acetaminophen) Mktg., Sales Practices, and Prods. Liab. Litig.*, 2016 WL 4039286, at *10 (E.D. Pa. July 28, 2016) ("The FDA drug approval process, FDA regulations, and protocols of drug labeling are topics that are likely unfamiliar to a layperson, and expert testimony on these topics will be helpful to the jury's understanding of the complex issues in this case."); *Lion Oil Co.*, 2015 WL 11112430, at *1–2 (expert "testimony regarding the historical development of the policies and insurance industry practice and standards will provide the jury with the context it needs to understand the insurance policies at issue.").

cannot be made by general observation. *Hamilton v. Emerson Elec. Co.*, 133 F. Supp. 2d 360, 374–75 (M.D. Pa. 2001) (noting an expert's opinion did not offer anything more than would be available to a juror through "common observation" and citing cases in which "the witness was simply repeating what is common knowledge and common sense" and "did no more than state the obvious") (internal citations and quotation marks omitted).

The strike staffing industry is not widely known, and intentionally so, given the great stigma associated with crossing a picket line. It is for precisely this reason that Dr. Hatton's testimony is important evidence for the trier of fact to consider. Labor disputes are highly contentious and provoke a variety of feelings for all parties, regardless of the side in which they are on, or their level of involvement. *See, e.g.,* Ex. 73 [Waters Dep. 84:10-89:4] ("Q: What do you mean by the situation could be emotionally charged? A: Well there are people that are out of work, and they're fighting for their ethos. So people get emotional. You know, people have mortgages to pay."). It may be tempting for a trier of fact to rely on his or her gut instinct (whatever that may be), or to supplant the evidence in the case with his or her own knowledge and/or experience with labor disputes.

Dr. Hatton's testimony provides valuable, reliable, well-researched evidence that will be helpful to the trier of fact, and which can be considered with the other documentary and testimonial evidence in the case. Her testimony goes directly to the central questions of the case relevant to all RWs, although, as Strom concedes, it does not seek to supplant the role of the jury by opining on the ultimate issue. Strom's attempt to highlight various testimony that it believes may contradict Dr. Hatton's conclusions, or points at which Dr. Hatton deferred to the testimony of fact witnesses (*see, e.g.* Mot. to Strike at 15-17) are simply not a basis for the Court to exclude her testimony. *See In re Suboxone Antitrust Litig.*, 2021 WL 662292, at *11 ("Contradictory evidence, however,

would not provide a basis for the exclusion of these experts' opinions." *Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408, 414 (3d Cir. 2002) ("A party confronted with an adverse expert witness who has sufficient, though perhaps not overwhelming, facts and assumptions as the basis for his opinion can highlight those weaknesses through effective cross-examination")).

Moreover, Dr. Hatton's testimony is helpful to the trier of fact when evaluating the credibility of the testimony of Strom's management witnesses, who have an incentive to portray their company's actions, objectives and motives in a manner that supports their defense of the case.[29] Indeed, Strom's lawyers' proclivity for making statements to this Court that are flatly contradicted by their own witnesses' testimony[30] further supports the helpfulness of Dr. Hatton's expert testimony in ensuring that the record evidence receives a fulsome and fair consideration by the applicable trier of fact, either at the summary judgment stage or at trial. Ultimately, whether and how much a trier of fact credits Dr. Hatton's testimony goes to the weight, not the admissibility of her evidence.

## V.       CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests the Court deny Strom's motion to strike the expert testimony of Dr. Hatton.

---

[29] *See, e.g.,* Ex. 83 [Hatton Dep.] at 106:12-24 (Q: How do you know why companies do what they do? A: Well, I can – based on my professional – based on my research into this industry and how companies have used temp agencies and strike staffing agencies in the context of labor disputes, and by analyzing the ways that they have done so, I can gain an understanding into [why] they do so. Of course, you could ask the companies themselves, but I've been asked to use my professional assessment of this industry to explain how I understand why they do so.).

[30] *Compare* Strom Opp. to Plaintiff's Mot. for Class Cert. at 2 (stating that the PAA and Picket Line Agreement "are not employment agreements") *with* Ex. 5 [30(b)(6) Dep.] at 216:5-7 (Q: Was [the PAA] the employment agreement between Strom and the replacement workers? A: Yes, I believe so, yes.); *See also* Ex. 6 [Hans Dep.] at 201:4-203:6 (Q: Does [the Picket Line Agreement] set out the intent of Strom about the expectations of replacement worker behavior when they were traveling to and crossing the picket line on the ATI project? A: It does. Q: Were these terms and conditions of employment with Strom? A: At this point, I would say yes. Q: Do these bullet points describe obligations that replacement workers had to satisfy in connection with their employment with Strom? A: I would say so, yes.).

Dated: January 7, 2022                    Respectfully submitted,

                                          *s/ Sarah R. Schalman-Bergen*
                                          Sarah R. Schalman-Bergen (Pa. Bar ID 206211)
                                          Krysten Connon*
                                          LICHTEN & LISS-RIORDAN, P.C.
                                          729 Boylston Street, Suite 2000
                                          Boston, MA 02116
                                          Direct: (267) 256-9973
                                          Main: (617) 994-5800
                                          Fax: (617) 994-5801
                                          ssb@llrlaw.com
                                          kconnon@llrlaw.com

                                          Michaela L. Wallin
                                          BERGER MONTAGUE PC
                                          1818 Market Street, Suite 3600
                                          Philadelphia, PA 19103
                                          Tel.: (215) 875-3000
                                          Fax: (215) 875-4620
                                          mwallin@bm.net

                                          Joseph H. Chivers
                                          The Employment Rights Group
                                          100 First Avenue, Suite 650
                                          Pittsburgh, Pennsylvania 15222
                                          jchivers@employmentrightsgroup.com

                                          Michael K. Yarnoff*
                                          KEHOE LAW FIRM
                                          Two Penn Center Plaza
                                          1500 JFK Boulevard, Suite 1020
                                          Philadelphia, PA 19102
                                          Telephone/Fax: (215) 792-6676
                                          myarnoff@kehoelawfirm.com

                                          **Pro hac vice* to be filed

                                          *Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I certify that, on January 7, 2022 the foregoing was served electronically via CM/ECF, which will send a notice of electronic filing to all parties of record.

/s/ Sarah R. Schalman-Bergen
Sarah R. Schalman-Bergen

*Counsel for Plaintiff*