# EXHIBIT 90

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

RALPH SMITH, individually and on
behalf of all those similarly situated,

                    Plaintiff,
                                        Civil Action

        vs.
                                        No. 19-147

STROM ENGINEERING CORPORATION,

                    Defendant.
_____


        Transcript of ZOOM VIDEOCONFERENCE ORAL ARGUMENT
proceedings recorded on January 27, 2022, in the United
States District Court, Pittsburgh, Pennsylvania, before
The Hon. Patricia L. Dodge, United States Magistrate Judge


APPEARANCES:

For the Plaintiff:          Sarah R. Schalman-Bergen, Esq.
                            Krysten Connon, Esq.
                            Lichten & Liss-Riordan, P.C.
                            729 Boylston Street, Ste. 2000
                            Boston, MA 02116

                            Michaela Wallin, Esq.
                            Berger Montague, P.C.
                            1818 Market Street, Ste. 3600
                            Philadelphia, PA  19103

For the Defendant:          Theodore A. Schroeder, Esq.
                            Taylor N. Brailey, Esq.
                            Littler Mendelson, P.C.
                            625 Liberty Avenue, 26th Floor
                            Pittsburgh, PA  15222


Court Reporter:             Deborah Rowe, RMR, CRR
                            700 Grant Street, Ste. 5300
                            Pittsburgh, PA  15219
                            (412) 471-2510


Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

1           P R O C E E D I N G S

2                    - - -

3           (1:30 p.m.; Zoom videoconference proceedings:)

4           MS. ECKENRODE:  This Honorable Court is now in

5   session; The Honorable Patricia L. Dodge now presiding for

6   the United States District Court, Western District of

7   Pennsylvania.

8           THE COURT:  Can everyone hear me all right?

9           MR. SCHROEDER:  Yes, Your Honor.

10          THE COURT:  I'm going to adjust my sound so I can

11  hear.  I want to welcome everyone here today.  We're here in

12  the matter of Ralph Smith versus Strom Engineering

13  Corporation at Docket No. 19-147.  I'm going to ask counsel

14  to enter their appearances, please.

15          MS. SCHALMAN-BERGEN:  Good afternoon, Your Honor.

16  This is Sarah Schalman-Bergen from Lichten & Liss-Riordan on

17  behalf of Plaintiff and the proposed class.  With me is

18  Krysten Connon from my office as well and my co-counsel,

19  Michaela Wallin, from Berger Montague.

20          THE COURT:  Welcome.

21          MR. SCHROEDER:  Good afternoon, Your Honor.  Ted

22  Schroeder and Taylor Brailey from Littler Mendelson for the

23  Defendant, Strom Engineering Corp.

24          THE COURT:  Welcome to you as well.  I would note

25  for the record that we're here today for oral argument on

1   Defendant's motion to strike the report and testimony of Erin

2   Hatton, Ph.D.

3            I want to let counsel know that I appreciate your

4   excellent filings in advance, which I have reviewed.  I

5   certainly appreciate whatever you would like to highlight for

6   me that is contained in your respective memorandum or

7   otherwise.  I'm going to allot approximately half an hour per

8   side.  You're not required to take that half an hour, but if

9   we can limit it to around then, that seems appropriate, given

10  what we're here for today, but if you need a little bit more

11  time, you just need to let me know.

12           With that, Mr. Schroeder, are you ready to proceed?

13           MR. SCHROEDER:  I am, Your Honor.  Thank you.  And

14  I don't think I'll need nearly the full half an hour, but

15  we'll see how it goes.

16           THE COURT:  Understood.

17           MR. SCHROEDER:  As you noted, Your Honor, we're

18  here today on Defendant's motion to strike Plaintiff's

19  expert.  Plaintiff has put forth Dr. Hatton, a witness who no

20  Court has ever recognized as an expert on a topic, which no

21  Court has ever recognized as appropriate for expert testimony

22  using a methodology that's neither identified nor appropriate

23  under the governing standards for admissible expert testimony

24  under Rule 702.

25           Dr. Hatton's proposed testimony would provide no

1    insight to the trier of fact in this case as to any key

2    issue.  Importantly, it provides no insight to the agreement

3    between Strom and its workers as to what work they would

4    perform on the ATI replacement job, and it provides no

5    insight that's not available to the jury or other trier of

6    fact on the actual conditions on the picket line during the

7    ATI strike.

8            And I highlighted those two particular issues

9    because the Court also has before it the motion for class

10   certification, and those are the two things that the

11   Plaintiff primarily relied upon in identifying the issues

12   that were common to the class.

13           Now, as the Court noted, we have briefed this

14   issue, and I don't want to just repeat what's in the brief,

15   but there are a couple of points on I think each of sort of

16   the two main categories of issues which I'd call fit and --

17   or helpfulness to the jury and qualifications that I would

18   like to highlight and address and then would be happy to

19   answer any other questions that the Court might have.

20           I actually want to start first with the issue of

21   whether or not this testimony would even be helpful to a

22   jury.  And then I'll circle back to the issue of whether or

23   not Dr. Hatton might even before qualified to provide it.

24           In their brief opposing our motion, the Plaintiffs

25   identified a bullet point list of topics that Dr. Hatton

1    would provide opinion on.

2           And I won't read through every one of them again.

3    They're on page 9 and 10, but they address issues such as

4    whether crossing the picket lines were an essential component

5    of the replacement workers' job and whether crossing the

6    picket lines is difficult and sometimes dangerous work.

7           And again, I think those are important issues in

8    this case because, as you know, from reading the Plaintiff's

9    class certification brief, they've argued that the agreement,

10   as they put it, as set forth in project assignment agreements

11   between Strom and its workers, you know, governs whether or

12   not this is compensable work.  And certainly Dr. Hatton

13   doesn't have any insight at all into what the agreement

14   between Strom and its workers was.

15          They also note that she could provide testimony on

16   whether crossing picket lines is difficult and sometimes

17   dangerous work.  But Dr. Hatton in her report doesn't offer

18   anything that would be helpful to the jury on that issue.

19          She noted that she doesn't have any firsthand

20   knowledge of what the conditions were; and really, firsthand

21   or otherwise, she didn't really seem to have any knowledge

22   whatsoever about what the conditions actually were on the

23   picket lines at the ATI work sites where the Strom

24   replacement workers were working.  And more to the point,

25   there's nothing that she could offer that would be helpful to

1    a jury which couldn't be provided by a lay witness.

2            The testimony of what lay witnesses and people who

3    were actually there will establish, whether or not the

4    conditions were dangerous or otherwise contributed to a

5    situation that might be somehow relevant to whether this work

6    was compensable, but nothing about Dr. Hatton's conclusions

7    about what might generally happen on the picket line is

8    helpful to that analysis.  So really there is nothing that

9    she can offer that's going to assist the jury in the key

10   issues in this case.

11           I think if you look at the first paragraph of the

12   Plaintiff's opposition brief, it really lays bare what the

13   purpose of introducing Dr. Hatton in this case is or at least

14   attempting to use her.

15           The Plaintiff says that Strom operates in the

16   shadowy world of strike staffing.  And this is part of their

17   ongoing theory in this case to impugn Strom's legitimate and

18   legal business.  Whether or not strike staffing is shadowy or

19   somehow an improper business is not an issue in this case.

20   It's a theory they've tried to pursue throughout this case.

21   It has nothing to do with the obligations of the workers and

22   whether their time is compensable.

23           And the last thing I wanted to note on this point

24   is that in their opposition to our motion, the Plaintiff said

25   that in denying Strom's motion to strike the reference to

1 Dr. Hatton's research in the pleadings, the Court already
2 rendered a preliminary determination on this issue.

3        That's a complete mischaracterization of the
4 Court's ruling on the motion to strike.  In fact, the Court
5 went out of its way to say it wasn't making any determination
6 on that issue.

7        And if you look at the Court's opinion, the Report
8 and Recommendation on the motion to strike, and this is
9 Document -- Docket No. 19, I'll read directly from it.  It
10 says, "While the Amended Complaint may contain factual
11 details beyond those necessary to meet the pleadings
12 standards, the Court cannot conclude at this stage of the
13 proceedings that the allegations of the Amended Complaint are
14 so unrelated to Plaintiff's claims as to be unworthy of any
15 consideration.

16        "Moreover, there is no substantial prejudice to
17 Strom since the inclusions of these allegations in the
18 Amended Complaint is not dispositive of whether they are
19 legally sufficient, significant or admissible and, therefore,
20 do not confuse the issues."

21        So the Court basically acknowledged that it wasn't
22 going to strike the allegations because there was no
23 particular prejudice to Strom to be included in the
24 pleadings.  But it went out of its way to say that it wasn't
25 making any determination as to whether those allegations were

1    admissible, and the opinion doesn't discuss Dr. Hatton

2    specifically at all.  So the idea that that opinion somehow

3    was a preliminary determination on the issue is just wrong.

4              So for all of those reasons as well as those set

5    forth in the brief, we don't believe that there's any

6    testimony that Dr. Hatton can offer that would aid a fact

7    finder in resolving the critical issues in this case.  Now,

8    with respect to --

9              THE COURT:  Excuse me just for a moment.

10             MR. SCHNEIDER:  Sure.

11             THE COURT:  Before you move on to qualifications,

12   which I think was your next order of business, you indicated

13   I believe during your argument on the fit issue that

14   Dr. Hatton has no knowledge of the actual conditions that

15   existed or some words to that effect.

16             I know that in one of the Appendices to her report

17   she lists any number of documents, depositions and so forth

18   that she reviewed.  Are you saying she did not apply those

19   facts to her opinions in this case?

20             MR. SCHROEDER:  Well, yes, she did testify that she

21   read the depositions in the case, but I think she had -- I

22   think what she testified also in her own deposition was that

23   with respect to her conclusion that picket lines may be

24   dangerous, she didn't really have any knowledge as to how

25   dangerous they may have been on any particular occasion or on

1   any day.

2            So she knows what she read in someone else's

3   testimony; but, again, that's testimony that can just as

4   easily be heard and digested by the finder of fact.

5            THE COURT:  But did she apply that testimony and

6   other facts to the basis for her opinions?

7            MR. SCHROEDER:  It's not clear to me how she did.

8   I mean I think that she -- I think she -- what she said was

9   that it was consistent with her general understanding of what

10  picket lines might be like, but again, I think that's a

11  little too vague to be helpful in this case.

12           THE COURT:  All right.  Thank you.

13           MR. SCHROEDER:  With respect to the qualifications,

14  I want to focus primarily on the lack of a methodology here

15  and, in particular, two things that were raised in

16  Plaintiff's opposition.

17           First, contrary to what the Plaintiff said in their

18  brief, it's clear that the Daubert standard does apply to

19  this type of expert testimony.  And in particular, since

20  we're looking at a Rule 23 motion, at least most immediately

21  here, in the In Re:  Blood Reagents Antitrust Litigation

22  case, Third Circuit 2015, the Court said that the Plaintiff

23  cannot prove that the Rule 23 prerequisites have been met

24  and, in fact, nor can Plaintiff establish through evidentiary

25  proof that Rule 23(b) is satisfied with expert testimony

1    that's insufficiently reliable to satisfy the Daubert

2    standard.

3            So we believe that under the governing Third

4    Circuit law, that the Daubert standard does apply to

5    Dr. Hatton's testimony.  And the other cases that we cited in

6    our brief also include social science type testimony of the

7    type offered here.

8            The other component I wanted to address with

9    respect to qualifications and methodology is that one of the

10   primary arguments in our brief is that, you know, there was

11   no methodology used by Dr. Hatton in coming to her

12   conclusions in this case.

13           In their opposition on pages 9 and 10, the

14   Plaintiffs -- excuse me -- 11 and 12, the Plaintiffs said

15   that Dr. Hatton's methodology was what they referred to as a

16   typology.  But the typology that she refers to, number one,

17   was a methodology she used in writing her 2014 Cornell Labor

18   Review argument, not the methodology she actually used in

19   this case.

20           Moreover, the Plaintiffs don't cite to any case law

21   that would support the idea that typology was an appropriate

22   methodology under Rule 702; and, in fact, there are multiple

23   cases that have held that it's not.  Those include U.S. v.

24   Raymond, 700 F.Supp. F.2d 142, a District of Maine case from

25   2010 and U.S. v. Thomas, 2006 WestLaw 140558, a District of

 1   Maryland case from January of 2006.

 2          So even if this testimony could somehow be

 3   considered helpful to a jury, we don't believe that

 4   Dr. Hatton has used the methodology to draw her opinions as

 5   permissible under Rule 702.

 6          I'm happy to answer any other questions the Court

 7   has, but those were the main points that I wanted to

 8   emphasize.

 9          THE COURT:  Thank you, Mr. Schroeder.

10   Mr. Schroeder, I do have a couple of questions for you.  Do

11   you have a position regarding what methodology would be

12   appropriate here?

13          MR. SCHROEDER:  No.  I guess -- I don't know if

14   there is one.  And I thinking that's part of the issue here,

15   is that we're writing on a clean slate.

16          I mean again, this is, like I said, an expert that

17   has never testified in a Federal Court case, and I'm not

18   aware -- we tried to find -- we scoured the case law for any

19   sort of similar expert testimony.

20          I think honestly the only ones that the Plaintiff

21   even cited in their brief are ones in different industries,

22   like one was in the insurance industry, for example, and we

23   couldn't find anything that was comparable to this industry.

24   So I don't know if there's a separate methodology that's

25   appropriate, but there's not one here that would satisfy the

1    standard.

2         THE COURT:  Does it matter that Dr. Hatton hasn't

3    testified in any other matter?  I don't think there's any

4    rule that requires you to be an expert in multiple cases; is

5    there?

6         MR. SCHROEDER:  No.  No.  I don't think that

7    there's -- certainly there's a first time for everyone.  But

8    I think that the point is just that this is not -- her

9    expertise under the standards of Rule 702 is not something

10   that's previously been recognized, and we don't think the

11   standard is met here either.

12        THE COURT:  One final question I have for you on

13   qualifications is that I know that in your memorandum you

14   spent some time talking about the fact that, according to

15   what you've indicated, Dr. Hatton doesn't have any firsthand

16   knowledge.  She hasn't worked for a strike staffing company.

17   She hasn't been on a picket line.  Is any of that required

18   for an expert to be able to testify in an area of expertise?

19        MR. SCHROEDER:  I don't know that it's necessarily

20   required.  I do think in most of the instances, even, again,

21   in the ones that the Plaintiff cited that related to -- the

22   two cases they cited related to industry experience, again,

23   the one was insurance, and I can't remember what the other

24   one was off the top of my head.  It was a different industry

25   as well.  But I believe that the individuals there did

 1   have -- were basing their conclusions on research, but in
 2   part on experience in the industry as well.
 3              So I think it's all part of the overall analysis.
 4   I don't think it's an absolute qualification, but I think,
 5   again, just reviewing -- we don't believe that reviewing the
 6   research -- the research alone in this case is sufficient to
 7   qualify her as an expert on these issues.
 8              THE COURT:  All right.  Thank you very much,
 9   Mr. Schroeder.  I appreciate your argument.
10              Ms. Schalman-Bergen, are you going to be arguing
11   this matter on behalf of the Plaintiff?
12              MS. SCHALMAN-BERGEN:  I am, Your Honor.  Thank you.
13   I'm happy to just start, or if you have specific questions,
14   Your Honor.
15              THE COURT:  No.  You may feel free to start.  Thank
16   you.
17              MS. SCHALMAN-BERGEN:  Thank you, Your Honor.  One
18   thing I just want to address as a threshold matter is this
19   idea that this approach is somehow novel or hasn't been used
20   before or that we're trying to do something different than
21   what happens before.
22              Our brief laid out several things that Your Honor
23   has highlighted.  Experts do not need to have first-hand
24   personal knowledge in order to be experts.
25              Professors and individuals who have devoted their

1   careers to research on various topics routinely testify and

2   provide helpful information in Federal Courts, and we've

3   cited to a number of cases in our brief where such experts

4   were deemed to be helpful to the trier of fact.

5            I do want to highlight one additional case, and I

6   know Mr. Schroeder has put forth some additional cases that

7   we haven't had the opportunity to look at, but to the point

8   and the idea that's been raised several times that this is

9   somehow new ground we're breaking, one of the things that

10   when I was reading the cases last night on both sides is that

11   I did realize that neither side had cited cases involving a

12   wage and hour case or an expert.

13            The vast majority of the cases that Defendants

14   cited I believe are inapposite, as we discussed --

15   inapposite, I always forget how to pronounce that one, but I

16   would say that, Your Honor, it's not relevant because they

17   involve the specific scientific evidence about a design

18   defect.

19            And I want to be clear about something Mr.

20   Schroeder said that I think is wrong.  We're not saying that

21   Daubert doesn't apply.  Nor are we saying that Daubert

22   shouldn't be applied at the Rule 23 stage.  I think the case

23   law is clear about that.

24            But the cases that we've cited talk about the fact

25   that when you're not doing like a hard science testing, like

 1    an elevator or a design defect, that the case law is also

 2    very clear that some of the Daubert things that are

 3    enumerated just aren't strictly applicable.  And we've cited

 4    case law to that effect that social scientists who were

 5    providing this type of academic research that is being

 6    provided here, it doesn't make any sense to apply that same

 7    scrutiny to it.

 8           And so like a lot of the critique that Strom has,

 9    what number of people and what statistical amount, and as we

10    described, I think that they're confusing sort of a

11    quantitative methodology -- which is not what Dr. Hatton

12    used.  It's a qualitative methodology -- which frankly is

13    long -- is part of -- is part of what she does, part of what

14    she teaches.  It's part of what she has been trained upon,

15    and it's part of what she does in her research that has been

16    submitted to peer review where people in her field have

17    confirmed that what she does is well within the established

18    methodology of her field.

19           But I did want to point to one case that is also a

20    wage and hour case because I recognize that we didn't cite

21    one in our cases either, although I do think our cases are

22    helpful to Your Honor, so if you look at a case Zheng versus

23    Liberty Apparel Co., which is 556 F.Supp. 2d 284 out of the

24    Southern District of New York in 2008, that involves a wage

25    and hour case involving labor practices in the garment

1    industry.

2          And there the Court find that Plaintiff's expert

3    Dr. Richard Greenwald, who is an assistant professor of

4    history, who opined on the basis of his knowledge about the

5    history of the garment industry and the background, the Court

6    found that he was well qualified under Daubert to provide

7    that, that his testimony was reliable, subject to good,

8    testable methodologies, and was helpful to the trier of fact.

9          So the Court found that his testimony was relevant

10   because it is probative of the industry custom and historical

11   practices of the garment industry, which was an issue

12   specifically deemed material to a factor that was set forth

13   in the appellate decision about the underlying claim.

14         And so I don't think we need that case to prove

15   that Dr. Hatton's testimony is sufficient and should be

16   admitted.  But I think it does provide some context.

17         Here we're talking about the nature of work.  Is

18   this commute time compensable?  And the Third Circuit has

19   rendered a decision that instructs us and instructs the Court

20   on what factors to look at.  But one of Strom's primary

21   defenses, and it's not supported by the record evidence, but

22   you heard it from them over and over again, is that this is

23   just a regular commute just like everyday people going to

24   work.

25         And Dr. Hatton provides context which is not within

1    a general person's knowledge about how this industry, a

2    specialized industry, and it is shadowy, and I think that's

3    important because there's a great deal of stigma surrounding

4    this industry.  So I think it's important for people to

5    consider the way it actually works.  And it's part of the

6    reason why there's not a lot of research about this industry.

7            Dr. Hatton is one of the few professors in

8    academics who have studied this industry, and she provides

9    helpful context to explain why this is, in fact, different

10   than a regular commute.

11           And when we think about how a trial would shape,

12   and I believe that this case should be decided on summary

13   judgment, that's clear.  So to the extent it went to a jury,

14   they would have their management witnesses come up and

15   provide testimony, and I think the testimony they've already

16   given is pretty damning, but some of it is self-serving.  So

17   they would describe how this is the same as a normal

18   temporary -- a normal temp job.  Right?

19           And so we would have our witnesses, who include the

20   replacement workers, who will come and testify about their

21   personal experiences.  But with respect to our clients, these

22   are low-wage workers who were put in this situation and kind

23   of did what they were told.

24           And so to have Dr. Hatton be able to present this

25   contextual testimony where she talks about based on her

1   research, based on her studies of the industry, how the

2   industry works, and how one might think differently about

3   what the management witnesses are saying about this being

4   just similar to a normal commute, it provides a helpful

5   context.

6        Now, the trier of fact does not have to find that

7   credible.  Certainly they can assign whatever weight they

8   want to it.  But that's not the role of the Court in this

9   gatekeeping function.  In this function the Court's role is

10  just to determine whether there's some reason why this is not

11  appropriate for a jury to hear.

12       And I would submit to Your Honor that Dr. Hatton is

13  extremely qualified.  She has extensive training.  She holds

14  herself as an expert.  She is subject to -- she's published

15  several books on the temporary labor economy, which is

16  directly relevant to this, and she's published articles

17  directly on this sub-industry.

18       Those articles have been published in the Cornell

19  ILR Review.  And Defendants didn't respond to this point, but

20  the idea that the Cornell ILR review would publish something

21  that lacks methodology is just simply not true.

22       We've submitted a letter from the Cornell ILR

23  Review editors, who have talked about the very strict peer

24  review process that they underwent in all cases and have

25  talked about how they accept only about ten percent of the

1    articles that they went through.

2         And Strom has said to you, well, they're only

3    talking about that article.  It's not clear to me in the

4    deposition testimony that the questions were directed at

5    anything other than that article.

6         So the line of questioning and testimony that Strom

7    points to were questions that its lawyers were asking about

8    that article, suggesting that that article and the number of

9    NLRB cases reviewed lacks some sort of methodology.  So we're

10   addressing that to say there is a robust methodology

11   underlying that opinion.

12        And the fact that we cited to that opinion in the

13   complaint tells you something too.  We're not talking here

14   about an expert being led into this.  She published this

15   study prior to the Complaint; and, in fact, we're relying in

16   some ways on her study in prosecuting this case.  It is

17   inherently part of the theory of our case that we raised

18   since the beginning of this case.

19        So -- but then I'll say further with respect to her

20   actual report, her actual report followed the same rigorous

21   methodology that she is accustomed to in her research.  It's

22   a qualitative methodology.  She is a trained academic, and

23   she utilized that training to put forth this report.

24        And when you look at the report, I think it's

25   important to see the way it's structured, is that the vast

1  majority of the report is not actually about the specific

2  evidence in this case.  It's structured where the whole first

3  part of it is kind of presenting her research.

4        And Strom has not explained how that research is

5  within a trier of facts' general knowledge.  I don't think

6  they can because it is specific information about the

7  historical background of this industry.  I think it's

8  helpful.  I think it provides a great deal of context as to

9  why the specific activities at issue here were compensable,

10  as they were different from the nature of the generalization.

11        She then looked at all of the record in this case,

12  and one thing you haven't heard from Strom is that we've

13  cherry picked evidence; or, you know, the one case that Strom

14  cites that's not about scientific evidence, it's a design

15  defect, is this Obrycka case out of Chicago.  And in that

16  case, the Court was really focused.  Judge St. Eve appeared

17  to be very, very focused on the fact that Plaintiff's counsel

18  presented the expert with like an overview and summary of

19  points that they wanted incorporated and that the expert, in

20  fact, had made a significant change to the report based on

21  looking at what the Plaintiff's counsel did.

22        And that is very clearly not what has happened

23  here, and Strom has not said in any way that that's what

24  happened.  We provided Dr. Hatton with the full record.  And

25  that included evidence that Strom would say is favorable to

1    it, and we let Dr. Hatton come up with Dr. Hatton's

2    conclusion.

3            And her conclusion with respect to Strom is not

4    about the ultimate issue.  And you're not hearing that from

5    defense counsel either.  You're not hearing him say this is

6    an ultimate issue.  They've conceded in their brief that

7    she's not here to opine on the ultimate issue, and we agree

8    that that would not be permissible, all right, that she's not

9    doing that.

10           What she's saying when she looks at the facts and

11   the record evidence is that based on my research, based on

12   all of the work I have done about the temporary labor

13   industry and this industry in specific, I conclude that what

14   happened in this specific labor dispute at ATI is consistent

15   with my knowledge of the industry.  And that's it.  And then

16   the trier of fact can draw whatever conclusions and

17   inferences they want about the rest of the testimony.

18           So I think that that's kind of another important

19   piece.  I want to be mindful of what you're not hearing from

20   Strom about challenges.  That's another thing you're not

21   hearing from Strom.

22           And let me look at my notes to see what else I

23   have, but if Your Honor has questions, I'm happy to answer

24   them.

25           Oh, I wanted to highlight for Your Honor this idea

1    about the dangerousness.  And we didn't go into our brief in

2    great detail about the kind of things that they picked out on

3    page 11 and page 15 of the brief.  It says -- I thought that

4    those went much more to kind of cross-examination and not to

5    any sort of gatekeeping and admissibility issues, but I'll

6    say two things about those.

7            One is that if you actually read the excerpts, I do

8    not believe Strom has accurately summarized what the

9    testimony is here.  And I think that frankly that is true of

10   their briefing in the class certification briefing, and I

11   would just urge Your Honor in the context of looking at all

12   of this to actually review the testimony that we have

13   provided you with in great detail.

14           So, one, I think it mischaracterizes the testimony.

15           Two, I think that a lot of those points go to

16   arguments that Strom wants to make.  And that is perfect

17   fodder for cross-examination, although as we pointed out in

18   our reply brief, certain of these arguments have either

19   already been rejected by the Court or we don't think are

20   relevant.

21           We don't think it's relevant on any given day the

22   number of picketers there are, and we set forth in our reply

23   brief why that's not the case.  So the fact that they've

24   asked Dr. Hatton a question about that and they don't like

25   her answer is not a basis to exclude her testimony.

1          And they've focused a lot on this idea of what's

2     dangerous; right?  And is she opining on something as being

3     legally dangerous?

4          I think that that overstates what her conclusion

5     was in the context of all of the bullet points of which she's

6     talking about.  But I think your question, Your Honor, was on

7     point.  Are you contending that there is some sort of

8     analytical gap between the data that she reviewed and her

9     conclusions?  Because that is an appropriate thing for the

10    Court to consider when you look at the case law.

11         And I think that Mr. Schroeder says that, in fact,

12    he couldn't find that, and he couldn't say that that was too

13    big of an analytical gap.

14         And if you look at -- he wants to say, well, she

15    testified to this one thing, and so she just said I don't

16    know.  It was dangerous.  But that's not true.

17         If you look at pages 16 and 17 of her report, she

18    has about 15 to 20 footnotes that direct you to specific

19    evidence that talks about how dangerous this was.

20         She talks about testimony of Ryan Bash, who said

21    that crossing a picket line could be dangerous and that

22    workers could be subject to hostility, intimidation, great

23    amounts of pressure.

24         She talks about Jason Hahn, who is Strom's own

25    management witness, who described various incidents of

1  harassment, minimizing violence; and then she goes into the

2  actual evidence of that violence, and that's cited at

3  footnotes 93 through 99 that talk about property damage,

4  damage with a pellet gun, vans being struck, vans being hit.

5           And Strom can make the point that all those things

6  do not amount to danger.  All right?  But that's not a basis

7  to exclude her testimony, and I think that there is more than

8  sufficient evidence to draw the conclusion that in this

9  instance, in fact, it was very dangerous, which is consistent

10  with what Strom's president said in private correspondence

11  where he acknowledged just how dangerous this was for the

12  union workers.

13           So in summary, I think that that -- I think that

14  that piece of it is overblown and does not provide any basis

15  to exclude the testimony.

16           And the last thing I just want to say about

17  helpfulness, and then if Your Honor has questions, is -- you

18  know, this case is going to be tried in Pittsburgh to the

19  extent it's tried, and, again, I believe you should grant

20  summary judgment on the record.  But if it's tried, it's

21  going to be in Pittsburgh, and I think we need to acknowledge

22  that there are a lot of strong feelings about what happened

23  at ATI with its union.

24           We're going to have video that will show union

25  members and community members marching right outside the

1    doorsteps of this courthouse, marching to where Strom's

2    lawyers' offices are, shouting about what was happening when

3    they were locked out.

4          You had a group of workers who were brought in from

5    outside of the community, mostly black and brown workers, who

6    were put in these vans and forced to take the brunt of the

7    union's hostility towards them.  And it is very attempting,

8    no matter what side you're on, pro-union, anti-union, pro-

9    labor, to have a gut instinct of this.

10          I was reviewing Judge Hornak's oral argument

11    transcript back when we did the motion to dismiss, and it's

12    easy to have a gut response to this.

13          And what Dr. Hatton's testimony does is it provides

14    some context of this industry from a well-researched -- you

15    know, well supported by academic credentials and her own

16    research, and to provide that in some sort of context, and I

17    think that we're entitled to that.  I think it will be

18    helpful to the trier of fact, and I think it's especially

19    important to recognize in light of how emotional this

20    specific -- the nature of this case will be.

21          So I'll pause there.  I've said a lot of things,

22    and I'm happy to answer any questions Your Honor has about

23    that.

24          THE COURT:  Yes.  Let me just ask you and pick up a

25    little bit on your comment about context.  So I'm looking at

 1   page 3 of her report where she has several bullet points that
 2   are a summary of her opinions.  And I'm just going to pick
 3   through them.
 4        But where she talked about the essential component
 5   of a replacement worker's job being to cross picket lines and
 6   understanding that she then develops that throughout her
 7   report.  I guess I have two questions.
 8        First, will she be correlating that to the facts of
 9   this case?  In other words, is she going to be testifying or
10   providing any opinions on whether it was an essential
11   component here?  And secondly, if not, I'd like you to expand
12   a little bit about why that then remains helpful to the fact
13   finder.
14        And I've heard your argument already.  So don't
15   feel you have to repeat everything.  But just taking a
16   specific example, it would be helpful for me to hear from you
17   on that.
18        MS. SCHALMAN-BERGEN:  Yes.  So in answer to your
19   question, I believe, yes, she will.  So I think what she will
20   do, as she's laid out in her testimony, is talk about this --
21   the nature of this industry, how it works, how it works with
22   respect to her general knowledge of the industry and hiring
23   replacement workers to cross the picket line.
24        She has then reviewed a great deal of evidence,
25   every deposition transcript, the declarations that Strom

1    submitted of their management, picket line documents.  So

2    what she will then do is say this is consistent with what I

3    know generally about the industry, and here are the examples

4    that I point to.

5           And I think so you have the first part of her

6    report that talks about the generalized information, and then

7    when you start to go down to Section X of the report, which

8    talks about the case of Strom Engineering Corporation and the

9    ATI labor dispute, she's basically applying her -- she's

10   reviewing the record, and she's applying her knowledge of it

11   to this record in the same way that academics have done, the

12   insurance experts that we've cited have done, and the same

13   way that the expert did in this case that I talked about in

14   New York.

15          And so yes.  So the answer is yes, she will make

16   that link, and that's based on her review of the documents

17   and the record in the case.

18          THE COURT:  Thank you.  I appreciate your argument.

19          Mr. Schroeder, I'll give you the last word if you

20   have anything additional you'd like to add.

21          MR. SCHROEDER:  Just two quick things, Your Honor.

22   I don't think I said there wasn't an analytical gap in the

23   analysis, and I do think that the actual analytical gap here

24   is the assumption that, because something might happen in the

25   industry generally, it necessarily happened here in this

1   case.  I mean that's the only reason this sort of expert

2   testimony would even be useful here because, again, we have

3   witnesses to testify about what actually happened here.

4          And there's no reason to believe or no methodology

5   offered for explaining how this expert could conclude that,

6   because something happens in the industry generally, it must

7   have happened during the ATI strike.

8          In fact, she admits that she can't really draw that

9   conclusion.  I mean every strike is different.  Some have

10  lots of violence.  Some have none.

11         And what might happen in the industry generally

12  doesn't shed any light on what happened here.  And it also

13  doesn't shed any light on the issue of what's really the

14  issue in this case, which is did Strom agree to pay these

15  people for crossing the picket line?

16         So that's the analytical gap, and that's what's

17  really missing.  And I think it also sort of goes to this

18  point when Ms. Schalman-Bergen was talking about videos of

19  picketers in front of EQT Plaza in Downtown Pittsburgh, well,

20  what the heck does that have to do in this case?

21         The jury should never see that evidence.  It's

22  totally irrelevant.  It has nothing to do with what the

23  replacement workers knew about their jobs or what they did on

24  a day-to-day basis, and it just goes to sort of bolster the

25  point that the whole context relatedness here is about

1    maligning this industry and sort of bringing up inflamed

2    passions on one side or the other of labor disputes, which

3    again, doesn't have anything to do with the discrete issue in

4    this case.

5          I mean the reason there aren't experts in other

6    cases that we are finding opining on the issue of what

7    someone agreed to do is because it's just not -- it's not

8    something that requires expert testimony.  So I'll leave it

9    at that unless you have additional questions.

10          THE COURT:  So taking the example from the opinion

11    that I had used, the essential component opinion, you're

12    saying that that doesn't require expert testimony because

13    whether it's an essential component in this case would be

14    based on what the witnesses who were there, who guided the

15    management, who observed things would testify about, and

16    whatever that evidence is as opposed to what it might mean

17    generally or in some other case?

18          MR. SCHROEDER:  Right.  Both that specific context,

19    and also I would note in its first opinion in Smith 1, the

20    Third Circuit did focus on -- I think we've been focusing on

21    the briefing -- on how the agreement between Strom and its

22    employees was largely controlling here.  So what happened in

23    some other case or what happened historically doesn't really

24    have any impact on what was specifically agreed to here.

25          THE COURT:  All right.  Thank you, Mr. Schroeder.

1    I did say I'd give Mr. Schroeder the last word, but we all

2    want the last word.  So I'm happy to continue the discussion,

3    Ms. Schalman-Bergen, if you have anything else you wanted to

4    add?

5         MS. SCHALMAN-BERGEN:  I'll respect what you said,

6    Your Honor, and not do a sur-surrebuttal, but I do need to

7    make one point that has come up in the briefing, is that I

8    think that Strom is fundamentally misstating the Third

9    Circuit's decision that we need to look at to see whether the

10   agreement said whether they would pay these individuals.

11        I do not think that's what the Third Circuit held.

12   The Third Circuit held let's look and see if it was a duty.

13        Strom has said that several times in their briefing

14   in cert., and now you've heard it, and I want to be very

15   clear that the Pennsylvania Minimum Wage Act does not permit

16   an employer and an employee to agree around the confines of

17   the Pennsylvania Minimum Wage Act.

18        And the Smith decision did not say that we look at

19   the agreement to see whether they agreed to pay it.  We

20   looked at the agreement, and I agree we should look at the

21   project assignment agreement and the picket line agreement.

22   I agree.

23        I did not know we would have smoking gun evidence

24   like that.  I had no idea when we went up to the Third

25   Circuit that there would be such smoking gun evidence that

1    specifically said from Strom here are the things, the

2    obligations that you must do and not do in the course of your

3    commute and on your -- in crossing the picket line; and if

4    you do not do them, you'll be fired.  I had no idea the

5    evidence would be that clear.  But what we don't look at

6    those agreements for is whether or not the agreements say and

7    we will pay you for that.  That is legally irrelevant, and

8    the Third Circuit did not say otherwise.

9                 THE COURT:  Thank you.  All right.  Anything

10   further before we conclude today?

11                MR. SCHROEDER:  No, Your Honor.

12                THE COURT:  I want to express to counsel my

13   appreciation for your very helpful briefing and your

14   arguments here today.  We'll put out a decision on this as

15   soon as possible, and I look forward to seeing you a bit down

16   the road.  So that concludes our proceeding here today.

17   Thank you.

18                MS. ECKENRODE:  Court is adjourned.

19                (Proceedings were concluded at 2:14 p.m.)

20                            - - -

21                  C E R T I F I C A T E

22                I, Deborah Rowe, certify that the foregoing is
     a correct transcript from the record of proceedings in the
23   above-titled matter.

24   S/Deborah Rowe  _____

25   Certified Realtime Reporter